**No. 26-10394**

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————

X CORP.,

*Plaintiff-Appellant/Cross-Appellee*,

v.

WORLD FEDERATION OF ADVERTISERS,

*Defendant-Appellee/Cross-Appellant*,

MARS, INCORPORATED; CVS HEALTH CORPORATION; NESTLE SA; NESTLE USA, INCORPORATED; ABBOTT LABORATORIES; COLGATE-PALMOLIVE COMPANY; LEGO A/S; LEGO BRAND RETAIL, INCORPORATED; PINTEREST, INCORPORATED; TYSON FOODS, INCORPORATED; SHELL USA, INCORPORATED; SHELL BRANDS INTERNATIONAL AG; ORSTED SERVICES A/S,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the
Northern District of Texas,
No. 24-cv-114

———————————

**OPENING BRIEF FOR PLAINTIFF-APPELLANT**

———————————

|  |  |
|---|---|
| | PAUL D. CLEMENT |
| CHRISTOPHER G. RENNER | *Counsel of Record* |
| JONATHAN M. SHAW | JAMES Y. XI* |
| DHILLON LAW GROUP, INC. | CHADWICK J. HARPER* |
| 2121 Eisenhower Ave. Suite 608 | CLEMENT & MURPHY, PLLC |
| Alexandria, VA 22314 | 706 Duke Street |
| (415) 433-1700 | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | paul.clement@clementmurphy.com |
| | *Supervised by principals of the firm who are members of the Virginia bar |

*Counsel for Plaintiff-Appellant X Corp.*

August 5, 2026

## CERTIFICATE OF INTERESTED PERSONS

(1) Case No. 26-10394:  *X Corp. v. World Federation of Advertisers; Mars, Incorporated; CVS Health Corporation; Nestle SA; Nestle USA, Incorporated; Abbott Laboratories; Colgate-Palmolive Company; Lego A/S; Lego Brand Retail, Incorporated; Pinterest, Incorporated; Tyson Foods, Incorporated; Shell USA, Incorporated; Shell Brands International AG; Orsted Services A/S*

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- X Corp. is the Appellant in this case.  In the district court, X Corp. was represented by John Clay Sullivan and Jace Randall Yarbrough of S|L Law PLLC, as well as Harmeet K. Dhillon, Christopher G. Renner, Jonathan Mark Shaw, and Andrew K. Mann of the Dhillon Law Group, and in this Court, X Corp. is represented by some of the same counsel and Paul D. Clement, James Xi, and Chadwick Harper of Clement & Murphy, PLLC.

i

- The World Federation of Advertisers (former defendant-appellee) was represented in the district court by David C. Miller, Charles E. Elder, Ilan Borochov, Samuel T. Acker, and William S. Snyder of Bradley Arant Boult Cummings LLP, and was represented in this Court by some of the same counsel as well as Michael James Bentley, Brian M. Gillett, and E. Sawyer Needly, also of Bradley Arant Boult Cummings LLP.

- Mars, Incorporated (Defendant-Appellee) was represented in the district court by Katherine R. Hancock, Ralph H. Duggins, and Philip A. Vickers of Cantey Hanger LLP, Christopher Jason Fenton and Thomas C. Riney of Underwood Law Firm, and Karen Mary Lent and Noelle M. Reed of Skadden Arps Slate Meagher & Flom LLP, and is represented in this Court by some of the same attorneys as well as Margaret E. Krawiec and Michael A. Lanci of Skadden Arps Slate Meagher & Flom LLP.

- CVS Health Corporation (Defendant-Appellee) was represented in the district court by Bradley Timms of Brackett & Ellis PC and Jonathan Bradley Pitt, Kimberly Broecker, and Nicholas G. Gamse of Williams & Connolly LLP, and Christopher Jason Fenton and Thomas C. Riney of Underwood Law Firm, and is represented in this Court by some of the same counsel.

- Nestle SA (Defendant-Appellee) was represented in the district court by Carmine R. Zarlenga, Christina Luk, and Oral Pottinger of Mayer Brown LLP, as well as Anthony William Bates of Sherrill & Gibson PLLC, and is represented in this Court by some of the same counsel.

- Nestle USA, Incorporated (Defendant-Appellee) was represented in the district court by Gregg Costa, Russell H. Falconer, Scott Kristian Hvidt, and Prerak Shah of Gibson, Dunn & Crutcher, L.L.P., and is represented in this Court by some of the same counsel as well as by Arjun Pushkar Ogale, also of Gibson, Dunn & Crutcher, L.L.P.

- Abbott Laboratories (Defendant-Appellee) was represented in the district court by Christine Rua Harper and William Francis Cavanaugh, Jr., of Patterson, Belknap, Webb & Tyler, L.L.P., and Thomas M. Melsheimer of King & Spalding LLP, and is represented in this Court by some of the same counsel.

- Colgate-Palmolive Company (Defendant-Appellee) was represented in the district court by Fred A. Rowley, Jr., Jeffrey Bank, and Taylor Mayly Owings of Wilson Sonsini Goodrich & Rosati, P.C., and Lars Lee Berg of Kelly, Hart & Hallman, L.L.P., as well as Julia Hu of Orrick Herrington & Sutcliffe LLP, and is represented in this Court by some of the same counsel.

- Lego A/S and Lego Brand Retail, Incorporated (Defendants-Appellees) were represented in the district court by Chahira Solh, Kenneth Michael Dintzer, and Sima Namiri-Kalantari of Crowell & Moring LLP, and Minoo Sobhani Blaesche of Jackson Walker, L.L.P., and is represented in this Court by some of the same counsel as well as Ashley Lydia McMahon of Crowell & Moring, LLP.

- Pinterest, Incorporated (Defendant-Appellee) was represented in the district court by Brian Edward Robison of Brown Fox, P.L.L.C., and is represented in this Court by the same counsel.

- Tyson Foods, Incorporated (Defendant-Appellee) was represented in the district court by Clint Cowan and Michael K. Hurst of Lynn Pinker Hurst & Schwegmann LLP, and John Francis Terzaken, III of T&T Law Group, P.L.L.C., and Abram J. Ellis and Avia Gridi, of Simpson Thacher & Bartlett, L.L.P., and Joshua Hazan of King & Spalding LLP, and is represented in this Court by some of the same counsel.

- Shell USA, Incorporated and Shell Brands International AG (Defendants-Appellees) were represented in the district court by Carlos R. Rainer, Ellen B. Sessions, and Layne E. Kruse of Norton Rose Fulbright US, L.L.P., and are represented in this Court by some of the same counsel as well as Anne McGowan Johnson of Norton Rose

Fulbright US, L.L.P. Additionally, Shell plc (a former defendant in the district court, but not a party to this appeal) was represented by some of the same counsel.

- Orsted Services A/S (Defendant-Appellee) was represented in the district court by Avery Caroline Westerlund, George M. Kryder, Adam L. Hudes, Stephen M. Medlock, and Jason Michael Powers of Vinson & Elkins, L.L.P., and is represented in this Court by some of the same attorneys, as well as Michael A. Heidler and Samantha Garza, also of Vinson & Elkins, L.L.P.

- Unilever PLC and Unilever United States, Inc. (former defendants in the district court, and not parties to the appeal) were represented by John T. Cox , III, and Rachel Susan Brass of Gibson Dunn & Crutcher LLP.

- Twitch Interactive, Inc. (former defendant in the district court, and not a party to the appeal) was represented in the district court proceedings by Bradley R. Wilson of Wachtell, Lipton, Rosen & Katz.

(3) Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel of record certifies that X Corp. is a wholly owned subsidiary of X Holdings Corp., which is a wholly owned subsidiary of X.AI Holdings LLC, which is a wholly owned subsidiary of Space Exploration Technologies Corp. (a/k/a "SpaceX"), which is a

publicly held corporation (NASDAQ: SPCX).    Other than Space Exploration Technologies Corp., no publicly held corporation owns 10% or more of X Corp.'s stock.

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellant X Corp.*

vi

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for X Corp. respectfully requests oral argument. This complex appeal implicates vitally important antitrust doctrines and personal-jurisdiction questions that have profound implications for the Nation's antitrust laws. Ventilating those issues at oral argument would, counsel respectfully submits, likely prove helpful to the Court's consideration of these issues.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS.................................................. i

STATEMENT REGARDING ORAL ARGUMENT............................................... vii

TABLE OF AUTHORITIES...................................................................... x

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ............................................................. 4

STATEMENT OF THE ISSUES ............................................................... 4

      1.    Did the district court err in dismissing X's complaint with prejudice on the ground that X failed to plead antitrust injury? ........................................................... 4

      2.    Did the district court err in holding that it did not have personal jurisdiction over Ørsted and Shell International, and/or in denying X's requested jurisdictional discovery? ........................................................... 4

STATEMENT OF THE CASE................................................................... 4

I.    Factual Background ................................................................. 4

    A.    GARM Fosters "Unusual Collaboration" Among Advertisers. ........................................................................... 4

    B.    GARM Speaks for Advertisers and Wields a "Big Stick." ............... 9

    C.    Elon Musk Buys Twitter and GARM Threatens Another Boycott. ...........................................................................11

    D.    Defendants Boycott Twitter, Causing Massive Harm. ....................... 13

    E.    Congress Investigates GARM and Uncovers Collusion. ................... 15

II.    Procedural Background ............................................................. 16

SUMMARY OF ARGUMENT.................................................................. 19

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT ..................................................................................... 22

I.  The District Court Erred In Dismissing X's Complaint With
    Prejudice. ............................................................................... 22

    A.  X Pleaded A Classic Antitrust Injury................................ 22

    B.  X Pleaded Valid Claims Under the Sherman Act............... 26

    C.  At a Minimum, X Should Be Allowed to Replead. ........... 39

II. The District Court Erred in Holding It Lacked Personal Jurisdiction
    Over Ørsted And Shell International, And In Denying Jurisdictional
    Discovery As To Shell International, Nestle SA, And Lego A/S. ................ 41

    A.  The District Court Had Personal Jurisdiction Over Ørsted
        Under Rule 4(k)(1)(C) and the Clayton Act........................ 41

    B.  The District Court Had Personal Jurisdiction Over Shell
        International Under Rule 4(k)(2)......................................... 48

    C.  The District Court Further Erred in Denying Jurisdictional
        Discovery. .......................................................................... 53

CONCLUSION ................................................................................... 56

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
368 F.3d 1174 (9th Cir. 2004) ...................................................................42

*Adams v. Unione Mediterranea Di Sicurta*,
364 F.3d 646 (5th Cir. 2004) .....................................................................48

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal
Med.*, 103 F.4th 383 (5th Cir. 2024) ..........................................................39

*Associated Press v. United States*,
326 U.S. 1 (1945) ......................................................................................51

*Bankamerica Corp. v. United States*,
462 U.S. 122 (1983) ..................................................................................47

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) ...................................................................24

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ..................................................................................24

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*,
406 U.S. 706 (1972) ............................................................................ 44, 45

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................ 20, 22

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ........................................................ 2, 19, 23, 25

*Doucet v. Abbott Lab'ys, Inc.*,
2025 WL 1548534 (E.D. La. May 29, 2025) ..............................................55

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ..................................................................................31

*Elgin Nursing & Rehab. Ctr. v. HHS*,
718 F.3d 488 (5th Cir. 2013) .....................................................................44

*First v. Rolling Plains Implement Co., Inc.*,
 108 F.4th 262 (5th Cir. 2024)......................................................21

*Fish v. Kobach*,
 840 F.3d 710 (10th Cir. 2016).....................................................44

*FTC v. Superior Ct. Trial Laws. Ass'n*,
 493 U.S. 411 (1990)............................................................. 3, 36

*Fuld v. Palestine Liberation Org.*,
 606 U.S. 1 (2025)........................................................... 48, 49, 52

*Gibson v. FTC*,
 682 F.2d 554 (5th Cir. 1982).......................................................28

*Go-Video, Inc. v. Akai Elec. Co.*,
 885 F.2d 1406 (9th Cir. 1989)............................................. 43, 45, 47

*Greenhaw v. Lubbock Cnty. Beverage Ass'n*,
 721 F.2d 1019 (5th Cir. 1983)......................................................34

*Grunewald v. United States*,
 353 U.S. 391 (1957)...............................................................55

*Guidry v. U.S. Tobacco Co.*,
 188 F.3d 619 (5th Cir. 1999).......................................................50

*Hartford Fire Ins. Co. v. California*,
 509 U.S. 764 (1993)...............................................................53

*Hilgeman v. Nat'l Ins. Co. of Am.*,
 547 F.2d 298 (5th Cir. 1977).......................................................50

*Honey Bum, LLC v. Fashion Nova, Inc.*,
 63 F.4th 813 (9th Cir. 2023).......................................................27

*Icon Indus. Controls Corp. v. Cimetrix, Inc.*,
 921 F.Supp. 375 (W.D. La. 1996)....................................................47

*In re Auto. Refinishing Paint Antitrust Litig.*,
 358 F.3d 288 (3d Cir. 2004)..................................................... 42, 45

*In re HTC Corp.*,
   889 F.3d 1349 (Fed. Cir. 2018) ................................................................44

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) ....................................................................50

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ..................................................................29

*Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*,
   10 F.4th 422 (5th Cir. 2021) ...................................................................39

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
   725 F.3d 718 (7th Cir. 2013) ..................................................................46

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...............................................................................33

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..................................................................51

*Luallen v. Higgs*,
   277 F.App'x 402 (5th Cir. 2008) .............................................................50

*Matter of Ondova Ltd. Co.*,
   914 F.3d 990 (5th Cir. 2019) ..................................................................22

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
   806 F.3d 835 (5th Cir. 2015) ..................................................... 26, 27, 37

*Monkton Ins. Servs., Ltd. v. Ritter*,
   768 F.3d 429 (5th Cir. 2014) ..................................................................22

*Next Techs., Inc. v. ThermoGenisis, LLC*,
   121 F. Supp. 3d 671 (W.D. Tex. 2015) ...................................................55

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985)................................................... 27, 31, 32, 36

*Pace v. Cirrus Design Corp.*,
   93 F.4th 879 (5th Cir. 2024) ...................................................................53

*Pervasive Software Inc. v. Lexware GmbH & Co. KG,*
    688 F.3d 214 (5th Cir. 2012)..................................................................22

*Pulse Network, L.L.C. v. Visa, Inc.,*
    30 F.4th 480 (5th Cir. 2022)..................................................................23

*Rx Sols., Inc. v. Caremark, L.L.C.,*
    164 F.4th 436 (5th Cir. 2026)................................................................22

*Sanger Ins. Agency v. HUB Int'l, Ltd.,*
    802 F.3d 732 (5th Cir. 2015)................................................. 2, 22, 23, 25

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
    801 F.3d 412 (4th Cir. 2015)....................................................... 28, 29

*Singletary v. B.R.X., Inc.,*
    828 F.2d 1135 (5th Cir. 1987)...............................................................56

*Slack Techs., LLC v. Pirani,*
    598 U.S. 759 (2023)..............................................................................43

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
    253 F.3d 215 (5th Cir. 2001)....................................................... 30, 31, 37

*Texas v. BlackRock, Inc.,*
    2025 WL 2201071 (E.D. Tex. Aug. 1, 2025)..........................................33

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001)........................................................ 28, 33, 34

*Toys "R" Us, Inc. v. Step Two, S.A.,*
    318 F.3d 446 (3d Cir. 2003).................................................................53

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.,*
    496 F.3d 403 (5th Cir. 2007)........................................................ *passim*

*U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993)..............................................................................44

*United States v. Andreas,*
    216 F.3d 645 (7th Cir. 2000).................................................................29

*United States v. Realty Multi-List, Inc.,*
  629 F.2d 1351 (5th Cir. 1980)...................................................... 27, 28, 51, 52

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978)...................................................... 27, 33, 34

*W. Va. Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991)......................................................46

*Waggoner v. Denbury Onshore, L.L.C.,*
  612 F.App'x 734 (5th Cir. 2015)......................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
  549 U.S. 312 (2007)......................................................31

*Wyatt v. Kaplan,*
  686 F.2d 276 (5th Cir. 1982)...................................................... 53, 55

*Yoder Bros. v. Cal.-Fla. Plant Corp.,*
  537 F.2d 1347 (5th Cir. 1976)...................................................... 20, 32, 35, 37

**Statutes**

15 U.S.C. §1 ...................................................... 17, 26, 33, 49

15 U.S.C. §22 ...................................................... 3, 18, 42, 43

28 U.S.C. §1291 ......................................................4

28 U.S.C. §1331 ......................................................4

28 U.S.C §1337 ......................................................4

28 U.S.C. §1391(b) ......................................................47

28 U.S.C. §1391(c)(3) ......................................................45

28 U.S.C. §1391(d) ......................................................45

28 U.S.C. §1400(b) ......................................................45

**Rules**

Fed. R. Civ. P. R. 4(k)(1)......................................................41

Fed. R. Civ. P. R. 4(k)(2)..................................................................................48


**Other Authorities**

Areeda and Hovenkemp, Antitrust Law (1995)......................................................23

R. Bork, *The Antitrust Paradox* (2021) ...............................................................32

H. W. Fowler, Concise Oxford Dictionary of Current English (1931)...................43

*FTC et al. v. Dentsu et al.*,
    No. 4:26-cv-469 (N.D. Tex.), ECF 1 (filed Apr. 15, 2026) ......................... 29, 41

Press Release, FTC,
    FTC Takes Action to Restore Competition in the Digital Advertising
    Ecosystem, (Apr. 15, 2026),  https://perma.cc/9CB6-PB7N..............................16

Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*,
    106 Va. L. Rev. 1703 (2020) ...............................................................................53

A. Scalia & B. Garner, *Reading Law* (2012) .......................................................48

Norman J. Singer & Shambie Singer,
    *Sutherland Statutory Construction* (7th ed. 2025)..............................................43

Staff of H. Comm. on the Judiciary, 119th Cong., *Interim Staff Report on
    Exporting Censorship:  How GARM's Advertising Cartel Helped
    Corporations Collude with Foreign Governments to Silence American
    Speech* (Comm. Print June 27, 2025), https://perma.cc/L8AP-ZGL3......... 40, 41

World Federation of Advertisers, "Statement on the Global Alliance for
    Responsible Media (GARM)," (Aug. 9, 2024),
    https://perma.cc/26R7-V3PA.................................................................................17

Charles A. Wright & Arthur R. Miller,
    Fed. Prac. & Proc. (4th ed. 2026) ........................................................ 43, 44, 46

## INTRODUCTION

Conspirators in a group boycott generally work hard to cover their tracks. But here, whether out of unfamiliarity with U.S. antitrust law or simple self-righteousness, the conspirators occasionally said the quiet part out loud (or made it explicit in emails). As a result, X Corp. ("X") filed a complaint not just leveling allegations, but marshaling *actual evidence* of a group boycott aimed at pressuring Twitter (X's predecessor) to conform its advertising policies to the preferences of a cartel of advertisers and advertising agencies. A congressional investigation has uncovered more evidence confirming that the conspirators aimed to replace "competitive concerns" in advertising with "uncommon collaboration" in a manner fundamentally at odds with our antitrust laws. ROA.498. They were not content to leave the advertising practices of social media platforms to market forces or to make their own unilateral decisions about where to advertise (potentially yielding audiences to competitors) and so they agreed to adopt and implement "brand safety standards," and withhold advertising from social media platforms deemed non-compliant. Thus, in November 2022, when Elon Musk acquired Twitter, defendants contacted the entity overseeing these efforts to learn "[its] perspectives about the Twitter situation and a possible boycott from many companies." ROA.487. Possibility became reality, and once the boycott was underway, co-conspirators reveled in reports that "they [Twitter] are 80% below revenue forecasts." ROA.488.

In light of this wealth of evidence and plausible allegations of a joint boycott, this case should be proceeding to discovery and trial. Instead, the district court dismissed this case at the threshold, while denying leave to amend the complaint for good measure. The district court reached that counterintuitive conclusion only by committing multiple legal errors.

First, the district court rejected X's claims based on a fundamentally flawed view of antitrust injury. The district court confused the question whether X had alleged an antitrust injury with the merits question whether X sufficiently alleged that the boycott "restrain[ed] competition." ROA.2449. This Court has repeatedly warned against conflating antitrust injury and the merits, *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997), and instructed district courts to assess antitrust injury by assuming a merits violation and asking only whether X's injuries were the sort the antitrust laws were meant to prevent. *See Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015). Here, there is no serious question that X, which lost hundreds of millions of dollars as the direct target of a group boycott that stifled competition, suffered antitrust injury.

Second, the district court not only conflated antitrust injury and the merits, but got the merits inquiry flat wrong by insisting that a group boycott only violates the antitrust laws if the co-conspirators include one of the target's competitors. That is squarely contrary to governing precedent. "[T]he Supreme Court has itself found a

2

horizontal boycott to be per se unlawful where the conspirators were all suppliers, *not competitors*, of the victim." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414 (5th Cir. 2007) (emphasis added) (citing *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 422-23 (1990)). Yet the district court was so convinced of its contrary view that it dismissed X's complaint with prejudice, notwithstanding an ongoing investigation by the House Judiciary Committee and related litigation brought by the Federal Trade Commission.

The district court compounded those antitrust errors by mistakenly dismissing certain defendants for lack of personal jurisdiction and denying X's request for jurisdictional discovery. In concluding that Ørsted Services A/S was not within reach of the Clayton Act's jurisdiction-creating provision, 15 U.S.C. §22, the district court took an approach contrary to two circuit courts and the best reading of the relevant statutory text. It then refused to credit X's plausible allegations that Shell International participated in the conspiracy, and faulted X for not specifying which member of two corporate families joined the conspiracy, while denying X jurisdictional discovery that would have answered that straightforward question.

This case involves an unusually brazen group boycott. That misconduct has drawn the attention of regulators and Congress. There is no valid reason that this effort by the direct victim to recover its massive economic losses from that boycott should not move forward.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over X's Sherman Act claims under 28 U.S.C. §§1331 and 1337. The district court entered final judgment on March 26, 2026, ROA.2451, and X timely filed a notice of appeal on April 23, 2026. ROA.2456. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.  Did the district court err in dismissing X's complaint with prejudice on the ground that X failed to plead antitrust injury?

2.  Did the district court err in holding that it did not have personal jurisdiction over Ørsted and Shell International, and/or in denying X's requested jurisdictional discovery?

## STATEMENT OF THE CASE

### I.     Factual Background

### A.     GARM Fosters "Unusual Collaboration" Among Advertisers.

Advertising is a cornerstone of the digital economy. For many social-media companies like X—which operates a microblogging platform previously known as "Twitter"—the revenue from advertising allows them to provide their services to consumers at low or no cost. Advertisements usually appear in users' feeds on the site, and X sells advertising directly to advertisers as well as advertising agencies. ROA.496. Advertising space is sold through auctions in which advertisers compete

4

by bidding for available advertising inventory.  ROA.537.  The winning bid gets its advertisement in front of users on the platform.  ROA.537.

In a competitive market, advertisers and advertising agencies compete fiercely to place their ads in optimal positions on social-media platforms.  That entails both putting the right ads in front of the right audience, ROA.534-35, and avoiding placing ads next to the wrong content (*e.g.*, a toy company might not want its ads displayed alongside alcohol-related content (or vice-versa)).  So, to customize the reach of their ads, advertisers typically negotiate individually with social-media platforms.  ROA.505.  But some advertisers found one-to-one negotiations costly and unsatisfying.  *See* ROA.498-99; ROA.505.

Enter GARM.  In 2019, the World Federation of Advertisers ("WFA") and some of its members established the "Global Alliance for Responsible Media," a.k.a. GARM.  ROA.496.[1]  GARM's membership included the so-called "Big Six"— advertising agency holding companies that collectively hold nearly every major advertising agency in the world.  At the time, WFA's members accounted for about 90% of brand spend on advertising worldwide.  ROA.497; ROA.490.  Although GARM included non-advertiser members, advertisers controlled the organization

---

[1] Previously, WFA was a defendant and had filed a cross-appeal.  Pursuant to a recent settlement, WFA has agreed to dismiss its cross-appeal, and X has agreed to dismiss its appeal as to WFA.  Dkt.119.

and represented their interests.[2]  GARM's Charter declared, "The GARM is a first-of-its-kind industry-wide, but advertiser-centric community of global brands, media agencies, media owners and platforms, and industry bodies."   ROA.497-98. Elsewhere, GARM documents explained that "GARM's governance advances an advertiser-led agenda that focuses on solutions that improve transparency, consistency, control and oversight on content monetization of content in social and digital media."  ROA.498.

GARM's leadership reflected and directed its advertiser-focused mission. GARM's "Steer Team" (a board of directors, essentially) featured representatives from several major corporations, including Defendant Mars, GroupM (the world's largest advertising agency), the American Association of Advertising Agencies, the Incorporated Society of British Advertisers (which represents brands in the U.K.), and the Association of National Advertisers (which represents brands in the U.S.). A former Mars employee, Rob Rakowitz, co-founded GARM and served as GARM's "Initiative Lead," working closely with the Steer Team to pursue GARM's goals.  ROA.496-97.

---

[2] Prominent social-media companies, including then-Twitter, also joined GARM. ROA.516; ROA.500.  Consistent with GARM's advertiser-centric ethos, though, they were not allowed to serve in leadership roles to "avoid conflicts of interest." ROA.498.

Chief among GARM's goals was using its "collective power" and "uncommon collaboration" to pressure social-media platforms into adopting its "Brand Safety Standards." Those standards governed how certain types of content would be displayed on advertiser-supported social media. ROA.500-01. GARM described this as its "core work"—"creating industry standards and solutions in monetization, seeking to improve transparency, consistency, control, and accountability for the placement of ads on content." ROA.501.

To develop its Brand Safety Standards, GARM organized four different "working groups." Those groups worked to develop "common definitions" and "common measures" of brand safety, as well as protocols for "independent verification" of compliance with GARM's standards. *See* ROA.501-03. The working groups met biweekly and submitted their recommendations to the Steer Team and GARM members for approval. ROA.501. A key function of GARM's Brand Safety Standards was identifying certain categories of content on digital media and social media platforms and providing controls for when and how ads appeared in relation to content in those categories. Pursuant to GARM's "Brand Safety Floor and Suitability Framework," for example, advertisements could not appear in connection with content within those categories, and advertisements could appear in connection with social-media posts related to those categories only with advertisers' consent. ROA.502. That framework, along with various other policies

7

and protocols GARM advocated for, formed the organization's Brand Safety Standards.  ROA.503.

To give those standards teeth, GARM and its advertiser members fully embraced "uncommon collaboration."  GARM leadership detailed how its "goal is to remove harmful content from advertiser-supported media on digital media platforms, and ensure that the industry works together to ensure that this is prioritized by" platforms.  ROA.499.  Likewise, WFA explained that GARM's purpose was to offer GARM-member advertisers a means of collective bargaining to advance their collective economic interests by "moving from one-to-one and linear conversations" with sellers of advertising "to the collective power offered by our industry response; GARM."  ROA.500.  GARM's "collective power" helped advertisers shift costs onto social-media platforms that had previously been borne by advertisers.  Through the Brand Safety Standards, GARM-member advertisers collectively shifted to social-media platforms a portion of the costs individual advertisers had previously borne by forcing the social media platforms to (1) proactively remove certain content and (2) adopt tools to help advertisers to more easily avoid certain content.  ROA.505.

Importantly, GARM exercised that collective power through its rules for membership.  As a condition of joining GARM, members "agree[d] to adopt GARM solutions to improve business operations."  ROA.507.  For GARM's advertiser and

advertising agency members, that meant agreeing to enforce the implementation of the Brand Safety Standards by the social-media platforms from which they purchased advertising. *See* ROA.506-510. Indeed, GARM documents specifically contemplated—and required—members' "agreement to adopt and implement [GARM] solutions both internally and where working with partners," *e.g.*, social-media platforms. ROA.507.

### B.   GARM Speaks for Advertisers and Wields a "Big Stick."

Not long after its founding, GARM demonstrated how "uncommon collaboration" worked in practice. In 2020, GARM members, including Mars and CVS Health, boycotted Facebook, Instagram, and Twitter. WFA facilitated that boycott by surveying WFA members about their willingness to boycott those platforms and sharing the survey's results with its members, giving them insight into what other, competing advertisers planned to do. ROA.416. The boycott proved effective; it ended only after the platforms agreed—in discussions with the GARM Steer Team—to abide by the Brand Safety Standards. ROA.416.

Given its function and track record, GARM members sometimes reached out to GARM for information about potential boycotts of media companies that did not comply with GARM's standards. In 2022, for example Coca-Cola reached out to GARM to inquire about a boycott of Spotify, a music and podcast streaming platform. Asking whether members had shared "concerns around Spotify

misinformation coming from the Joe Rogan podcast," ROA.547, the executive said, "[s]pecifically I am wondering if anyone has said that they are boycotting Spotify from an advertising perspective." ROA.547. The executive underscored "[i]t would be great to hear anything you have heard from other advertisers." ROA.547. GARM's reply did not reflect any caution about boycotts; instead, it offered GARM's assessment of Spotify's adherence to GARM's brand-safety standards and said GARM was happy to keep Coca-Cola "up to speed on these conversations." ROA.547. Within a week, Rakowitz emailed Spotify to demand a meeting between Spotify's higher-ups and GARM, emphasizing that he spoke for "the Steer team – which you will recall functions as a board of directors and brings together" prominent advertisers and agencies, including defendant Mars. ROA.514. To amplify the pressure on Spotify, Rakowitz then raised the prospect of "press commentary on this incident," suggesting GARM might release a statement deeming Spotify out of compliance with GARM's Brand Safety Standards, which would trigger a boycott by GARM-member advertisers and ad agencies. *See* ROA.514.

In 2022, GARM flexed its muscles and forced changes to Meta's business operations. Meta, a GARM member and operator of prominent social-media platforms including Facebook and Instagram, announced changes to the way in which it reported to advertisers and advertising agencies where advertisements were appearing on its platforms. What prompted these changes? Rakowitz claimed credit

10

for "a significant win *we forced*." ROA.500 (emphasis added). And Rakowitz wanted it known this was no one-off. In anticipation of WFA's executive committee in Greece, Rakowitz wrote: "This should be a message to the ExecCo for Athens - our demands are being met." ROA.500. "We need to get the ExecCo to understand," Rakowitz continued, "that we're operating with a Roosevelt doctrine of 'speaking softly and carrying a big stick[.]'" ROA.500.

### C. Elon Musk Buys Twitter and GARM Threatens Another Boycott.

In April of 2022, Elon Musk made public that he had become Twitter's largest shareholder. Soon thereafter, Musk and Twitter announced that they had reached a deal for a Musk-led group's purchase of Twitter. That deal closed on October 27, 2022. ROA.515. WFA and others feared that the change in ownership might mean that Twitter would deviate from GARM's Brand Safety Standards. ROA.515.

On October 31, 2022, WFA and GARM both posted statements emphasizing that brand safety was a "non-negotiable" for advertisers. ROA.516-17. WFA's missive—a public letter to Musk—stated that "[d]espite the transition in ownership, we expect Twitter to uphold its previous commitments to GARM," and emphasized that it would be "monitoring Twitter's actions" on the brand-safety front. ROA.516. Notably, too, WFA underscored that as it developed a perspective on Twitter's conduct, it would "share these views with members, as we have with previous events," and that members would "leverage such insights as part of their own

11

independent assessments and decision-making processes." ROA.516-17. GARM's post on Twitter—addressed to Musk—hit a similar note, underscoring that brand safety was "non-negotiable" and that "we expect Twitter to uphold its commitments to GARM." ROA.517. Given GARM's past practice of boycotting non-compliant platforms, as well as its rules for members, those statements were understood as a public declaration that unless Twitter abided by the Brand Safety Standards to GARM's satisfaction, advertisers would act collectively to cut off spending on the platform. *See* ROA.516-520.

WFA knew Twitter could be vulnerable to a GARM-led boycott. As of 2022, public reporting indicated that 90% of Twitter's revenue stemmed from advertising. ROA.515. Prior boycotts (and the threat of them) had provided proof of concept. So GARM members reasonably wondered if the organization would run the same play again. Hence Ørsted's November 2022 email seeking "[GARM's] perspectives about the Twitter situation and *a possible boycott from many companies*." ROA.487 (emphasis added).

Around the same time, GARM's Rakowitz emailed Twitter about "calls for boycotts and counter-boycott." ROA.521. Within days, he followed up again, warning Twitter that its failure to supply him (and, via him, the GARM Steer Team) with information they wanted was creating a "mushrooming effect"—amplifying the threat of a boycott. ROA.521. And internally, GARM was abuzz—the GARM Steer

12

Team highlighted "Brand Safety Concerns" with Twitter's "Adherence to GARM Standards." ROA.521.

Days after Ørsted's "possible boycott" email—and days after Rakowitz warned Twitter about "calls for boycotts"—the GARM Steer Team conducted a "WFA-GARM Benchmark Survey" of WFA members and GARM members, including both advertisers and advertising agencies. ROA.522. That survey sought information on the plans that these competing advertisers had with respect to purchasing advertising from Twitter in light of Musk's acquisition of the company. As with the 2020 boycott of Twitter and other platforms, this survey was aimed at facilitating a boycott by gathering and then disseminating information about the plans of competing advertisers. In total, 118 advertisers and advertising agencies (all members of WFA and/or GARM) responded. Afterwards, GARM's Rakowitz shared the survey's results with WFA's Executive Committee and widely among GARM members. ROA.522.

### D.    Defendants Boycott Twitter, Causing Massive Harm.

Following the October 31 statements from GARM and WFA that Brand Safety Standards were a "non-negotiable," GARM members ceased or curtailed ad spending on Twitter. Defendants belonged to GARM. *See* ROA.489-93.[3]

---

[3] Certain defendants have denied being GARM members themselves, though they have not contested that a member of their corporate family belonged to GARM. *See infra* at pp. 53-54. X has alleged that the members of these corporate families acted

Consistent with their membership in GARM and GARM's rules, defendants stopped or radically curtailed their spending on Twitter (and later X). For example, Mars ceased purchasing advertising from Twitter in the United States, and purchased only a de minimis amount outside the United States, after October 2022. Likewise, after November 2022, Tyson Foods purchased only a de minimis amount of advertising from Twitter, while Ørsted, Abbott, Colgate, Lego, and Pinterest ceased purchasing any advertising from Twitter. Around the same time, Nestle and Shell ceased purchasing advertising from Twitter in the United States, and made minimal purchases outside the country, while CVS Health sharply cut its purchases of advertising before eventually cutting off all ad-spending on the platform after December 2022. *See* ROA.531-32. Given the lucrative advertising opportunity represented by the universe of Twitter users, as evidenced by the reality that all these companies had previously purchased advertising on Twitter, the decision to stop advertising on Twitter was not an easy one for any company to take alone, as it would mean yielding an important advertising opportunity to competitors. *See* ROA.522-23; ROA.534-35. The group boycott enabled by GARM's "collective power" ameliorated those concerns.

---

with a unity of purpose in boycotting Twitter. *See* ROA.492 (Lego entities); ROA.491-92 (Nestle entities).

In December of 2022, WFA and GARM led negotiations with Musk and Twitter concerning brand safety. *See* ROA.526-29. Following those discussions, Twitter agreed to take some steps to adhere to GARM's Brand Safety Standards. ROA.526-27. That was evidently not enough for GARM. On a members' call on December 8, GARM and its members discussed at some length the dynamic with Twitter and the results of GARM and WFA's benchmark survey. ROA.528.

Meanwhile, the boycott continued. As intended, it severely harmed Twitter's business. ROA.487-88; ROA.537-38. GARM celebrated that fact. The following February, GARM's Rakowitz took credit for reports that "they [Twitter] are 80% below revenue forecasts." ROA.488. Not only did the boycott mean X lost revenue from those who ceased or curtailed their ad-spending, it forced X to lower its prices. Yet other social-media platforms—those deemed compliant by GARM—were enabled to charge above-market prices for their advertising. *See* ROA.534. And the boycott continued despite X's brand safety practices meeting or exceeding GARM's Brand Safety Standards and aligning with industry norms. *See* ROA.533 ("More than 99 percent of X's measured ad placement in 2023 and 2024 appeared adjacent to content scored above the GARM Brand Safety Floor.").

### E.     Congress Investigates GARM and Uncovers Collusion.

GARM's activities eventually drew the attention of the House Committee on the Judiciary. The committee launched an investigation and through subpoenas of

15

WFA and GARM, as well as an interview of a senior GARM executive, uncovered remarkable evidence of collusion. *See* ROA.489; ROA.529. During the investigation, an interim staff report noted that "[t]he information uncovered to date of WFA and GARM's collusive conduct to demonetize disfavored content is alarming." ROA.489. The report also observed that "[t]he extent to which GARM has organized its trade association and coordinates actions that rob consumers of choices is likely illegal under the antitrust laws and threatens fundamental American freedoms." ROA.489. Notably, too, the FTC launched a probe into related collusion by ad agencies, which ultimately settled. *See* Press Release, FTC, FTC Takes Action to Restore Competition in the Digital Advertising Ecosystem, (Apr. 15, 2026), https://perma.cc/9CB6-PB7N (explaining that "[a]d agency giants agree to stop unlawful collusion that imposed uniform standards on 'brand safety'").

## II.    Procedural Background

In light of the evidence of collusion uncovered by Congress, X sued WFA and others, including defendants Mars, Incorporated; CVS Health Corporation; Nestle SA; Nestle USA, Incorporated; Abbott Laboratories; Colgate-Palmolive Company; Lego A/S; Lego Brand Retail, Incorporated; Pinterest, Incorporated; Tyson Foods, Incorporated; Shell USA, Incorporated; Shell Brands International, AG ("Shell International"); and Ørsted Services A/S ("Ørsted"). *See* ROA.486-578 (X's operative complaint). X alleged that the defendants—along with others—engaged

in an antitrust conspiracy by carrying out an unlawful group boycott and establishing an anticompetitive information exchange, both in violation of §1 of the Sherman Act, 15 U.S.C. §1.[4] As to the boycott claim, X alleged that the defendants, instead of competing for advertising space on Twitter, colluded through GARM and curtailed or completely stopped buying advertising on Twitter and caused it massive losses in advertising revenue while also distorting the broader market for digital advertising on social-media platforms. ROA.537-38; *see also* ROA.531-34. As to the information-exchange claim, X alleged that the defendants, again acting through GARM, carried out the boycott in part by exchanging information relating to their willingness and intent to boycott Twitter through surveys and other means. ROA.539-40.[5]

The defendants jointly moved to dismiss the complaint. ROA.982-1044. Some defendants also disputed personal jurisdiction, including Ørsted, Shell International, Nestle SA, and Lego A/S. *See* ROA.952-78 (Ørsted); ROA.841-73 (Shell International); ROA.1073-96 (Nestle SA); ROA.889-917 (Lego A/S). X

---

[4] Many other co-conspirators chose to settle with X before X filed its Second Amended Complaint (and another did thereafter). *See* ROA.1463 n.1.

[5] WFA disbanded GARM shortly after X filed suit. *See* World Federation of Advertisers, "Statement on the Global Alliance for Responsible Media (GARM)," (Aug. 9, 2024), https://perma.cc/26R7-V3PA.

opposed those motions, ROA.1345-1452; ROA.1935-61, and sought contingent jurisdictional discovery, ROA.1762-1844.

The district court disposed of all those motions in a single order. As relevant here, the district court concluded that X failed to state a claim under the antitrust laws because it did not sufficiently allege an antitrust injury. That was so, the district court reasoned, because even though X suffered economic harm as the direct target of a concerted effort to reduce competition, "[i]f the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury." As such, the district court held, both of X's antitrust claims necessarily failed. ROA.2443-50. Based on that view, the district court also denied X's request to replead, deeming any amendment futile. ROA.2449-50.

As to personal jurisdiction, the district court concluded that 15 U.S.C. §22—the Clayton Act's jurisdiction-granting provision—did not permit it to exercise jurisdiction over Ørsted. ROA.2430-37. The district court also determined it lacked personal jurisdiction over Shell International because X had not sufficiently alleged Shell International's participation in the boycott, ROA.2421-25, and that X's arguments in favor of personal jurisdiction over Lego A/S and Nestle SA were unavailing. *See* ROA.2425-27. And, as to Shell International, Nestle SA, and Lego A/S, the district court also denied jurisdictional discovery. On its view, when a plaintiff seeks to determine which member of a corporate family participated in an

antitrust conspiracy, jurisdictional discovery is categorically unavailable. ROA.2427-30.

## SUMMARY OF ARGUMENT

In dismissing X's complaint, the district court both asked the wrong questions and gave the wrong answers. First, as to X's antitrust claims, the district court injected a merits question (*i.e.*, has competition been restrained?) into the threshold antitrust-standing analysis. That was clear reversible error. This Court has made clear beyond cavil that an antitrust plaintiff need not establish an injury to competition to establish antitrust injury. *Doctor's Hosp.*, 123 F.3d at 305. The inquiry instead focuses on whether, assuming competition was restrained, the plaintiff's injury flowed from the restraint on competition. The direct target of a joint boycott readily clears that threshold hurdle.

The district court compounded its error by misapplying substantive Sherman Act law. The district court held that "illegal group boycotts must involve a competitor at some level." ROA.2444. Put differently, on the district court's account, only if an antitrust "claim … directly or indirectly involve[s] the plaintiff's competitor" could it possibly "state an antitrust injury." ROA.2444. That is flat wrong. This Court has long recognized a rule of *per se* illegality for "combinations ... designed to influence coercively the trade practices of boycott victims, rather than those of direct competitors." *Yoder Bros. v. Cal.-Fla. Plant*

*Corp.*, 537 F.2d 1347, 1364-65 (5th Cir. 1976).  And the district court's must-involve-a-competitor rule for group boycotts cannot be reconciled with the reality that "the Supreme Court has itself found a horizontal boycott to be per se unlawful where the conspirators were all suppliers, *not competitors*, of the victim."  *Tunica*, 496 F.3d at 414 (emphasis added).  The result makes perfect sense as this case well illustrates—if competitive forces are undisturbed, a company's unilateral decision to stop advertising on X could yield an important advertising edge to a direct competitor, while allowing X to choose its advertising policies based on competitive forces.  When advertisers collude to boycott X, by contrast, they eliminate the independent decision-making that would otherwise force each firm to weigh the competitive benefits of continuing to advertise on the platform, suppressing competitive rivalries and insulating the boycott from market forces.  The group boycott targeting X thus distorts competition in multiple markets in clear contravention of the antitrust laws.

Those errors cry out for reversal.  Had the district court undertaken the proper antitrust-injury analysis, it would be obvious that X plainly pleaded injuries "of the type the antitrust laws were intended to prevent."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  And had it not invented and implemented a must-involve-a-competitor rule for group-boycott claims, it would have recognized that X stated viable—indeed classic—claims under the Sherman Act.

The district court likewise erred as to personal jurisdiction, mistakenly finding that it lacked personal jurisdiction over several defendants on the current record, and then denying X's request for jurisdictional discovery to boot.  The district court's errors started with Ørsted, as the district court's reading of the Clayton Act's jurisdictional provision contradicts the best reading of the statutory text, and the only two on-point circuit precedents, while hamstringing American antitrust enforcement.  As to Shell International, the district court refused to draw the (highly plausible) inference that Shell International participated in the boycott simply because not *all* GARM members boycotted X.  Finally, the district court denied X's request for jurisdictional discovery on the theory that no such discovery should be available when a plaintiff seeks to identify which member of a corporate family harmed it.  But such discovery requests are often granted, and the district court's rule rewards corporate shell games while hamstringing antitrust enforcement against foreign companies.

## STANDARD OF REVIEW

The district court's decision to grant a motion to dismiss is reviewed de novo; the Court takes all well-pleaded facts as true and views all facts in the light most favorable to the plaintiff.  *First v. Rolling Plains Implement Co., Inc.*, 108 F.4th 262, 271 (5th Cir. 2024).  Surviving a motion to dismiss requires allegations that, taken as true, state a plausible claim for relief.  *See Rx Sols., Inc. v. Caremark, L.L.C.*, 164

21

F.4th 436, 441 (5th Cir. 2026). When a district court denies leave to amend a complaint based on a determination that amendment would be futile, de novo review applies. *Matter of Ondova Ltd. Co.*, 914 F.3d 990, 992 (5th Cir. 2019) (per curiam). The same standard applies when a district court concludes that it lacks personal jurisdiction. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 219 (5th Cir. 2012). This Court reviews the denial of jurisdictional discovery for an abuse of discretion. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014).

## ARGUMENT

### I.    The District Court Erred In Dismissing X's Complaint With Prejudice.

#### A.    X Pleaded A Classic Antitrust Injury.

1.    X sufficiently pleaded antitrust injury, and the district court erred in concluding otherwise. Antitrust injury forms one piece of antitrust standing. *See Sanger*, 802 F.3d at 737 ("Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status[.]"). Of those components, defendants challenged only antitrust injury below. *See* ROA.982-1072; *cf.* ROA.1498.

The goal of the antitrust-injury analysis is to determine whether a plaintiff has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.

22

That requirement reflects the straightforward intuition that a plaintiff that actually benefits from reduced competition is not the proper party to bring an antitrust action. As this Court has repeatedly instructed, in assessing antitrust injury, courts should not anticipate the merits, but should "assume[] an antitrust violation has occurred and then determine[] whether the plaintiff has … experienced 'antitrust injury' from the [presumed] violation." *Doctor's Hosp.*, 123 F.3d at 306 (citing 2 Areeda and Hovenkemp, Antitrust Law ¶360f, at 204 (1995 ed.)); *accord Sanger*, 802 F.3d at 738 (same); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491 (5th Cir. 2022) (similar). Importantly, too, "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp.*, 123 F.3d at 305. Thus a plaintiff need not "establish a market-wide injury to competition as an element of" antitrust standing. *Id.*

Under that framework, X alleged antitrust injury. Start with X's group-boycott claim. Viewed from the perspective of X's position in the marketplace, and assuming the defendants violated the Sherman Act, X "alleged losses and competitive disadvantage because of" the GARM boycott. That sort of harm "fall[s] easily within the conceptual bounds of antitrust injury." *Doctor's Hosp.*, 123 F.3d at 305; *see* ROA.537-38 (discussing massive losses in advertising revenue and a diminished ability to compete); *cf.* ROA.529 (GARM's Rakowitz celebrating X

23

coming in "80% below revenue forecasts" after he "challenged Musk on brand safety issues"). That makes sense—indeed, it is obvious that X "suffer[ed] an antitrust injury as the direct target[] of the boycott." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999). After all, the idea of the boycott was to create enough fiscal pain to force X to surrender to GARM's demands and utilize GARM's advertising standards. *See, e.g.*, ROA.517-18. And X's injuries flowed directly from defendants' anti-competitive and collusive conduct. *See, e.g.*, ROA.533-34. The defendants attempted to achieve an outcome different from that achieved by competitive forces and to do so at X's expense. That inflicts a classic antitrust injury.

Thus, the antitrust-injury analysis here should have been straightforward. As the Supreme Court has explained, "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) (quotation marks omitted). Furthermore, because the harms done to X by the defendants' unlawful information exchange were of the same sort as those from the boycott—the information exchange being a means by which WFA and GARM orchestrated and enforced the boycott—the district court should have swiftly concluded that X had pleaded antitrust injury as to both its claims.

24

2. The district court asked the wrong question and (unsurprisingly) got the wrong answer. At the outset, the district court failed to heed this Court's instruction to assume that antitrust violations had occurred and then simply evaluate whether X's claimed injuries flowed from the presumed reduction in competition. *Contra Doctor's Hosp.*, 123 F.3d at 306; *Sanger*, 802 F.3d at 738. Instead, the district court explained that X lacked antitrust injury by interposing a mistaken rule about the merits—namely that a boycott claim must "directly or indirectly involve the plaintiff's competitor." ROA.2444; *see id.* (maintaining that "illegal group boycotts must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement"). The district court framed that analysis in terms of an antitrust injury. *See* ROA.2443 ("*X Has Not Suffered Antitrust Injury*"). That was doubly mistaken. First, even if there were a rule that only group boycotts of competitors—and not suppliers—violate the antitrust laws, it would plainly be a merits rule that should not be injected into the antitrust injury analysis. *See Doctor's Hosp.*, 123 F.3d at 305; *see also, e.g.*, *Waggoner v. Denbury Onshore, L.L.C.*, 612 F.App'x 734, 736 n.3 (5th Cir. 2015) (per curiam) ("This antitrust injury requirement of antitrust standing is sometimes confused with 'injury to competition[,] ... which is often a component of substantive liability.'") (quoting *Doctor's Hosp.*, 123 F.3d at 305). Second, as shown in the next section, there is no such rule.

25

**B.    X Pleaded Valid Claims Under the Sherman Act.**

1. The district court not only conflated the antitrust-injury inquiry with the merits, but it got the merits inquiry flat wrong.    No principle of law or logic immunizes group boycotts directed to a supplier, as opposed to a direct competitor. Indeed, both the Supreme Court and this Court have recognized as much.  X stated valid claims under the §1 Sherman Act, 15 U.S.C. §1.

Such claims require a plaintiff to plead—and eventually to prove—"that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (quotation marks omitted).    Invoking §1, X contended that the defendants' conspiracy unreasonably restrained trade in the relevant market—digital advertising on social media platforms—through both a group-boycott claim (Count I) and an information-exchange claim (Count II).  *See* ROA.538-39 (group-boycott claim); ROA.539-40 (information-exchange claim).

Group boycotts may be *per se* violations of the Sherman Act or violations under the rule of reason.  *See MM Steel*, 806 F.3d at 848-49.[6] Information-exchange

---

[6] A *per se* violation of the Sherman Act involves categories of agreements which "are conclusively presumed to be unreasonable and therefore illegal."  *MM Steel*, 806 F.3d at 848.  *Per se* violations do not require "elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  *Id.*  In deciding whether an agreement violates the rule of reason, however, courts consider "a variety of factors, including specific information about the relevant business, its condition

claims are analyzed under the latter framework.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1364 (5th Cir. 1980).

***Group Boycott.***  X's allegations amply support a *per se* boycott claim or, in the alternative, a viable claim under the rule of reason.  To fall on the *per se* side of the line, a boycott "must be 'horizontal,' *i.e.*, it must involve an agreement among firms that ordinarily compete with one another at the same level of the market."  *See Tunica*, 496 F.3d at 412.  Additionally, to discern *per se* illegal boycotts from those analyzed under the rule of reason, courts have considered factors including whether (1) the conspirators hold a dominant position in the relevant market; (2) the conspirators control an element necessary for the boycott victim to compete; and (3) the extent to which procompetitive effects might justify the boycott.  *See id.* at 414-15 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294-96 (1985)); *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023) (similar).

X alleged a horizontal agreement here.  As to the agreement, multiple rationales support finding that element satisfied.  For one, GARM members agreed to adopt, implement, and enforce GARM's Brand Safety Standards, and the rules for

---

before and after the restraint was imposed, and the restraint's history, nature, and effect."  *Id.*

GARM members suffice to show concerted action. *See Realty Multi-List, Inc.*, 629 F.2d at 1361 n.20 ("The concerted action necessary to establish a Section 1 violation exists in the agreement of [the association's] members to adopt and apply these rules and membership criteria."). And for another, X alleged that the advertiser defendants accepted WFA and GARM's invitation to participate in the boycott, *see* ROA.531-33; ROA.538, and under this Court's precedents, taking up such an invitation suffices for concerted action, *see Gibson v. FTC*, 682 F.2d 554, 568 (5th Cir. 1982) (recommendation not to buy from boycott victim was "at the minimum, an invitation to boycott" and was accepted by performance of the requested act).

Not only that, but the consciously parallel conduct of the defendants—including their lockstep elimination of spending on X, and continuing their boycott through the filing of X's complaint, *see* ROA.531-34—combines with a host of "plus factors" to support the same conclusion. *See Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424-25 (4th Cir. 2015) (discussing how so-called "plus factors" support the inference that parallel conduct arose from a conspiracy). Among those plus factors, the defendants had shared economic motives for their boycott—shifting costs to X specifically and social-media companies generally by forcing them to abide by GARM's Brand Safety Standards—and engaged in an information exchange through their surveys, internal communications, meetings and calls. *See* ROA.505-06; ROA.539-40; *SD3,*

28

*LLC*, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."). As courts have recognized, meetings like GARM's provide ample opportunity for would-be competitors to meet and reach agreements. *See, e.g.*, *United States v. Andreas*, 216 F.3d 645, 654 (7th Cir. 2000); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (noting that exchanging "information directly at association meetings," though "not illegal in itself," "facilitates price fixing that would be difficult for the authorities to detect"). That is why participants in such meetings often receive warnings about the antitrust implications of colluding. Here, however, X's complaint already presented substantial evidence of an overt agreement to boycott X, and congressional reports and hearings have further substantiated the allegations in the complaint. All of this is remarkable given that GARM's initiative lead cautioned advertising agencies and others about the need for secrecy in their brand-safety discussions, itself an indication of an unlawful agreement. "The first rule of Fight Club is: You do not talk about Fight Club. The second rule of Fight Club is: *You do not talk about Fight Club.*" *FTC et al. v. Dentsu et al.*, No. 4:26-cv-469 (N.D. Tex.), ECF 1 at ¶79 (filed Apr. 15, 2026) ("Dentsu Complaint"). In short, X more than plausibly alleged an unlawful agreement.

29

X also plausibly pleaded that this agreement was horizontal. The conspiracy here existed between advertisers who "are direct, head-to-head competitors in the purchase of social media advertising from Twitter, and now X." ROA.537; *see* ROA.535-37. Importantly, "[t]o make a *per se* case, the horizontal agreement need not be between competitors of the victim." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001). Because the advertiser defendants compete "at the same level of the market"—*i.e.*, as purchasers of social-media advertising—the agreement is horizontal under *Tunica*. 496 F.3d at 412. Moreover, the conspirators had especial reasons to agree horizontally to boycott Twitter (now X). No one doubted that the universe of Twitter users was a highly attractive advertising market. *See* ROA.534-35. That is why the co-conspirators advertised on Twitter in the first place. Thus, a unilateral decision to stop advertising on Twitter/X risked yielding important advertising opportunities to rivals. *See* ROA.535; ROA.564 (Ørsted asking about "a possible boycott from many companies" while noting that Twitter "is an important platform for us in the US market"). By binding together, however, the co-conspirators could eliminate that concern while assuring themselves of sufficient market power that they could force Twitter/X to alter its policies (and thus distort competition in the social-media advertising market).

Other factors weigh in favor of deeming this conspiracy a *per se* violation, too. Defendants and their co-conspirators exercised enormous sway over the advertising market. WFA's members represent about 90% of global advertising spending, ROA.490, and X's allegations show GARM members had monopsony power, *i.e.*, the "power to force a [seller] to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (cleaned up); *see Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("Monopsony power is market power on the buy side of the market."). Recall, for example, GARM's boast that Meta made changes to its operations was "a significant win *we forced*." ROA.500 (emphasis added). And more specifically to Twitter, the price drop defendants' boycott caused shows direct evidence of their market power. *See* ROA.534; *Spectators'*, 253 F.3d at 225. The defendants' dominant market position counts in favor of finding a *per se* violation here. *See Nw. Wholesale Stationers*, 472 U.S. at 294-96; *Tunica*, 496 F.3d at 414-15.

Still other considerations point the same way. Take X's allegations that the defendants choked off X's access to advertising revenue. Advertising revenue is the lifeblood of the social media industry. *See* ROA.515. And through their own actions (and the influence they wielded over others), defendants severely restricted the flow of advertising revenue to X. *See* ROA.537-38. Where a boycott cuts off a victim's

31

access to an element necessary to compete, that reality also counsels in favor of a *per se* violation. *See Nw. Wholesale Stationers*, 472 U.S. at 294-96; *Tunica*, 496 F.3d at 414-15.

Nor was there any procompetitive justification for the alleged conspiracy. Boycotting Twitter to force it to succumb to GARM's demands and apply the Brand Safety Standards harmed competition, and any legitimate business-based justification that defendants might try to offer is severely undermined by the fact that X's brand safety practices equaled or surpassed GARM's Brand Safety Standards. *See* ROA.533. The antitrust laws do not tolerate dominant market actors strangling a boycott victim's access to a key competitive input. *See Tunica*, 496 F.3d at 414-15. It is for good reason, after all, that this Court has long recognized a rule of *per se* illegality for "combinations ... designed to influence coercively the trade practices of boycott victims." *Yoder Bros.*, 537 F.2d at 1365; *cf.* R. Bork, *The Antitrust Paradox* 347-48 (2021 ed.) (explaining that "there is little doubt" that a "naked boycott" "should be a per se violation of the Sherman Act" because "such behavior carries no possible benefit to consumers"). For those reasons, this Court should hold that X alleged a *per se* violation of the Sherman Act.

In the alternative, the boycott violated the rule of reason. The defendants' agreement restrained trade in the market for digital advertising on social-media platforms, both in the United States and globally. *See* ROA.537-38. And the boycott

both injured X and competition in that market, allowing other social-media platforms to charge rates above truly competitive pricing. *See* ROA.534. Especially in light of the power defendants wield within the market, their agreement to boycott X cannot be characterized as anything other than an unreasonable restraint on trade. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (noting market power is a key consideration).

***Information Exchange.*** X also plausibly alleged an information-exchange claim. Information exchanges often provide evidence of an antitrust violation, but can constitute an independent violation of §1 of the Sherman Act. *See Todd*, 275 F.3d at 198-99 (collecting authorities); *Texas v. BlackRock, Inc.*, 2025 WL 2201071, at *17-18 (E.D. Tex. Aug. 1, 2025). Courts especially attend to "the structure of the industry involved and the nature of the information exchanged" in this inquiry. *U.S. Gypsum Co.*, 438 U.S. at 441 n.16; *see, e.g.*, *BlackRock*, 2025 WL 2201071, at *18-19.

This claims centers on GARM's surveys related to boycotting social-media platforms, including Twitter. X alleged that GARM and WFA conducted three such surveys of GARM and WFA members, ROA.510; ROA.512; ROA.521-22, and that GARM disseminated the surveys' results with the goal (and effect) of facilitating the boycott, ROA.521-22; ROA.528; ROA.539-540. That constitutes an unlawful agreement, as an "active exchange of information establishes participation in an

33

agreement or conspiracy." *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1031 (5th Cir. 1983), *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Loc. No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986) (en banc); *see Todd*, 275 F.3d at 198-99.

In addition to an agreement to restrain trade, the information exchange harmed both competition and Twitter. That is especially evident with respect to the survey conducted in November of 2022 and widely disseminated to GARM members by December 8 of the same year. ROA.521; ROA.528. As X alleged, that survey gave advertisers information that inspired them to end or curtail their spending on Twitter (and/or gave them the confidence to stick with that approach). *See* ROA.539-40; ROA.487-88. Tellingly, too, that same month saw many of the defendants complete their elimination of ad purchases from Twitter. *See* ROA.531-32. Especially in an industry where the sales model involves auctions, as with X's advertising sales, ROA.537, knowledge about other bidders' willingness to boycott distorts the relevant market (*i.e.*, the market for digital advertising on social media platforms), *see* ROA.535-38; *cf. U.S. Gypsum Co.*, 438 U.S. at 441 n.16 (highlighting the "structure of the industry involved and the nature of the information exchanged" as salient factors). Thus X plausibly alleged that through their information exchange, defendants conspired to restrain trade in the relevant market. Rule 12 and the antitrust laws demand no more.

2. The district court concluded that X failed to state any viable claims; it was fundamentally mistaken.

First, as noted, the district court thought X's group-boycott claim failed because the conspirators did not include one of X's competitors. On its view, a claim like X's must "directly or indirectly involve the plaintiff's competitor." ROA.2444; *see id.* ("[I]llegal group boycotts must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement."). The district court viewed that test as fatal to X's claims. While acknowledging that X's boycott claim included Pinterest, a competing social-media platform, the district court brushed that aside because "the advertisers did not decide to boycott X at Pinterest's—or any other X competitor's—behest to secure the competitor's business." ROA.2446. Nor had "X alleged that advertisers, WFA, or GARM sought to become the supplier (a new social media company) themselves." ROA.2447. As such, X failed the district court's must-involve-a-competitor test.

In inventing that misguided rule, the district court mistook the familiar for the necessary. To be sure, in many group-boycott cases, a cartel of competitors take aim at a rival. But that is hardly the only way a horizontal group boycott can distort competition. This Circuit has found a *per se* boycott involving "combinations ... designed to influence coercively the trade practices of boycott victims, rather than those of direct competitors." *Yoder Bros.*, 537 F.2d at 1365. And "the Supreme

Court has itself found a horizontal boycott to be per se unlawful where the conspirators were all suppliers, *not competitors*, of the victim." *Tunica*, 496 F.3d at 414 (emphasis added); *see Superior Ct. Trial Laws. Ass'n*, 493 U.S. at 422-23. That precedent forecloses the district court's novel must-involve-a-competitor rule.

*Tunica* is a case in point. There, this Court sustained claims of a *per se* unlawful agreement made by competing casinos, all of which agreed not to buy advertising from a single website. *Tunica*, 496 F.3d at 407-08, 412. In so doing, this Court rejected the must-involve-a-competitor requirement imposed by the district court here. The *Tunica* Court noted that "the district court essentially found (though using the wrong terminology), that a group boycott can be *per se* unlawful only if it is *both* horizontal *and* at least one of the conspirators is a direct competitor of the victim." 496 F.3d at 412; *cf. id.* at 414 ("the district court erred in finding that the per se rule only applies in situations where one of the conspirators is a direct competitor of the victim."). Having established that no such requirement applied to *per se* group-boycott claims, this Court then remanded to the district court for it to consider in the first instance the *Northwest Wholesale Stationers* factors to determine if the allegations there rose to that level. *See id.* at 414-15.

*Tunica* squarely forecloses the district court's reasoning here. If a group boycott can be *per se* illegal absent "a direct competitor of the victim," *Tunica*, 496 F.3d at 414, then it cannot be correct that "illegal group boycotts must involve a

36

competitor." ROA.2444. *Accord MM Steel*, 806 F.3d at 850 (explaining that *Tunica* held "that the per se rule is not limited to group boycotts where the horizontal agreement is among competitors"). The district court never cited (much less distinguished) *Tunica*, even though X repeatedly invoked *Tunica* in its MTD opposition. *See, e.g.*, ROA.1463; ROA.1488-90. Nor, for that matter, did the district court discuss (or even cite) this Court's longstanding precedent setting out a rule of *per se* illegality for conspiracies aimed at coercively influencing boycott victims' trade practices, rather than direct competitors' businesses, *see Yoder Bros.*, 537 F.2d at 1365. And it did so despite X emphasizing that "[a]lthough *per se* illegal group boycotts often involve efforts to exclude competitors of the boycotting firms from the market, boycotts 'designed to influence coercively the trade practices of boycott victims, rather than those of direct competitors[,]' have also been held *per se* illegal." ROA.1488 (quoting *Yoder Bros.*, 537 F.2d at 1364-65). The district court's mistaken notion that "illegal group boycotts must involve a competitor," ROA.2444, simply cannot be squared with this Court's precedent, and the two cases the district court invoked—*Spectators'*, 253 F.3d at 221; *MM Steel*, 806 F.3d at 844—are not to the contrary. *Contra* ROA.2444.

Not only was the district court wrong to think that a group-boycott claim must involve a competitor, but it also erred in stating that X failed to "allege that Defendants acted to restrain competition." ROA.2449. To the contrary, X expressly

37

alleged that "[c]ompetition in the market for digital advertising on social media platforms has been restrained by the boycott." ROA.537.  X also alleged that while X had been forced to lower prices as a result of its boycott, "other social media platforms do not need to lower the price at which they offer to sell advertising to match the low prices offered by" X, since those "other social media platforms are all GARM members and know that GARM-member advertisers and advertising agencies have agreed not to purchase advertising from Twitter (and now X)." ROA.534.  Indeed, and as X explained, the GARM boycott represented "collective action among competing advertisers to dictate brand safety standards to be applied by social media platforms," which, in turn, "shortcuts the competitive process and allows the collective views of a group of advertisers with market power to override the interests of consumers." ROA.488.  In short, X amply detailed how the GARM boycott disserved consumer welfare and restrained trade, and the district court erred in concluding otherwise.[7]

Moreover, the district court never meaningfully addressed X's information-exchange claim.  It merely said that because (on its mistaken view) there was no

_____

[7] The district court also considered the possibility of construing X's boycott claim in terms of "eliminat[ing] competition at the advertiser level." ROA.2447.  But although the boycott also restrained competition at the advertiser level, *see* ROA.534-35, a proper understanding of X's group-boycott claim renders that alternate construction beside the point.

antitrust injury, the information-exchange claim failed, too. *See* ROA.2449 (holding X "failed to state *either* of its claims") (emphasis added). But the district court's conclusion on antitrust injury rested on its misunderstanding of group-boycott claims, so that analysis cannot support dismissal of the information-exchange claim. Because the district court misunderstood and misapplied the relevant law concerning group-boycott claims, then applied next to no law with respect to the information-exchange claim, its dismissal of those claims should be reversed. X's complaint— filed nearly two years ago to the day—more than passes the motion-to-dismiss test, and this case should at long last proceed to discovery.

## C.    At a Minimum, X Should Be Allowed to Replead.

The district court's decision to dismiss X's complaint with prejudice on the theory that further amendment would be futile receives de novo review, s*ee Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 430 (5th Cir. 2021), and cannot survive it. This Court has held that "[l]eave to amend should be liberally granted" in cases where "the plaintiff might be able to state a claim based on the underlying facts and circumstances." *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 394 (5th Cir. 2024). Given the facts and circumstances here, X should have at minimum been given an opportunity to replead.

39

That is especially so because the district court thought amendment would be futile because of its flawed view that only group boycotts including a direct or indirect competitor are unlawful.  Repleading would be pointless, the district court speculated, because "[t]he very nature of the alleged conspiracy does not state an antitrust claim," and "if facts existed that GARM operated at an X competitor's behest to put X out of business or that GARM advertisers sought to unfairly exclude competing advertisers from doing business, X would have pleaded those facts." ROA.2450.  For that reason, the district court had "no qualm" about dismissing with prejudice.  *Id.*  Because the district court's futility determination flowed from its erroneous view of antitrust injury and its misunderstanding of group-boycott claims, its futility finding is likewise errant.  *See supra* Part I.A-B.

While X's case should proceed to discovery, at a bare minimum, this Court should at least allow X to replead.  Doing so would allow X to add still more facts which have come to light since it filed its operative complaint.  *See, e.g.*, Staff of H. Comm. on the Judiciary, 119th Cong., *Interim Staff Report on Exporting Censorship: How GARM's Advertising Cartel Helped Corporations Collude with Foreign Governments to Silence American Speech* (Comm. Print June 27, 2025), https://perma.cc/L8AP-ZGL3.   Documents  produced  to  the  House  Judiciary Committee during its investigation "show that GARM drafted statements and guidance to members that amount to a call for a boycott of Twitter," *id.* at 21, while

others "reveal GARM's role in facilitating a boycott by disseminating nonpublic information about Twitter that GARM knew would trigger the boycott," *id.* at 9. Litigation has also uncovered more about GARM's covert and anticompetitive conduct. *See* Dentsu Complaint, *supra*, at ¶79 (GARM telling major advertising agencies that achieving their goals would require "*more than 'boycotts'*") (emphasis added). It would hardly be an exercise in futility to allow X to replead its claims utilizing this additional evidence and guidance from this Court.

**II.    The District Court Erred In Holding It Lacked Personal Jurisdiction Over Ørsted And Shell International, And In Denying Jurisdictional Discovery As To Shell International, Nestle SA, And Lego A/S.**

The district court mistakenly held that it lacked personal jurisdiction over Ørsted A/S and Shell International. It did so by misreading the statute relevant to Ørsted and misunderstanding the Fifth Amendment's import for Shell International. And it further erred by dismissing for lack of jurisdiction without allowing jurisdictional discovery.

**A.    The District Court Had Personal Jurisdiction Over Ørsted Under Rule 4(k)(1)(C) and the Clayton Act.**

Rule 4(k)(1)(C) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant … when authorized by a federal statute." Fed. R. Civ. P. R. 4(k)(1)(C). The Clayton Act serves as the authorizing federal statute in this instance, and it provides (in relevant part) as follows:

41

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. §22.

This provision of the Clayton Act serves as "the long-arm statute for federal antitrust suits." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004). The essential question here is how to understand the relationship between the language coming before the semi-colon (*i.e.*, the venue clause) and the language that follows the semi-colon (*i.e.*, the service clause), and, more specifically, how they apply to alien corporations. The district court reasoned that the clauses are "integrated," which means that the first sets out requirements that must be satisfied before service may be carried out. *See* ROA.2431. According to the district court, Ørsted was not subject to the district court's jurisdiction because it did not inhabit or transact business in the district nor could it be found there. ROA.2431.

The district court's reasoning is mistaken. As the only two circuits that have squarely ruled on the provision's application to alien defendants have explained, "the service of process provision on foreign corporations is independent of, and does not require satisfaction of, the specific venue provision under Section 12 of the Clayton Act." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 (3d Cir. 2004);

42

*see also Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989). That reading follows straightforwardly from the text. The pivotal words in the provision are "such cases," which appear in the service clause. *See* Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. §3818 (4th ed. 2026) ("Wright & Miller"). "The word 'such' usually refers to something that has already been 'described' or that is 'implied or intelligible from the context or circumstances.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (quoting H. W. Fowler, Concise Oxford Dictionary of Current English 1218 (1931)). Here, "such cases" refers to "[a]ny suit, action, or proceeding under the antitrust laws against a corporation." 15 U.S.C. §22. "Courts assume that when 'such' precedes a noun it refers to a particular antecedent noun and any dependent adjective or adjectival clauses modifying that noun, *but not to any other part of the preceding clause or sentence*." 2A Norman J. Singer & Shambie Singer, *Sutherland Statutory Construction* §47:33 n.1 (7th ed. 2025) (emphasis added). In the service clause, the "cases" described by the preceding provision are those "suit[s], action[s], or proceeding[s] under the antitrust laws against a corporation." 15 U.S.C. §22. So, under the usual rules of syntax, "such cases" incorporates by reference the modifications of the antecedent nouns (suit, action, proceeding)—*i.e.*, those specifying the cases' source of law (the antitrust laws) and the target of the suit (a corporation). Everything else in that first clause is irrelevant to the meaning of "such cases"—after all, the rest of the first clause only

43

says where those cases "*may* be brought." 15 U.S.C. §22; *see* Wright & Miller §3818 (the phrase "such cases" "refers … to cases that are brought under the antitrust laws against corporations and says only that they *may* be brought in the stated venues"). By saying that "all process *in such cases* may be served … wherever it may be found," the Clayton Act authorizes worldwide service in "[a]ny suit, action, or proceeding under the antitrust laws against a corporation"—full stop.

The punctuation dividing the clauses here—a semicolon—reinforces that reading. "Clauses separated by a semicolon are presumed to be independent clauses," as a semicolon "tends to suggest related but separate ideas and stands for 'or,' not 'and.'" *Elgin Nursing & Rehab. Ctr. v. HHS*, 718 F.3d 488, 494 (5th Cir. 2013) (citation and quotation marks omitted)); *see also Fish v. Kobach*, 840 F.3d 710, 741 (10th Cir. 2016) (similar). Because Congress split venue from service with a semicolon, and because "the meaning of a statute will typically heed the commands of its punctuation," *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993), the provision's punctuation counsels in favor of an independent reading.

As to foreign defendants like Ørsted, context buttresses that conclusion. As the Supreme Court has observed, since the time of the founding, "the long-established rule" has been "that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 714 (1972); *see also In re HTC Corp.*, 889 F.3d

44

1349, 1361 (Fed. Cir. 2018) (similar).  In *Brunette*, the Court considered that principle's relationship to the patent venue statute, 28 U.S.C. §1400(b), which prior decisions had made clear was the exclusive venue provision for patent suits.  But, as to alien defendants, *Brunette* explains, the rule of those decisions did not hold true, because Congress had enacted another provision—the Alien Venue Statute, then codified at 28 U.S.C. §1391(d)—that embodied the long-standing rule that aliens were "wholly outside" the venue laws.  *See* 406 U.S. at 713-14.  That rule—now codified at 28 U.S.C. §1391(c)(3)—provides that "[f]or all venue purposes … a defendant not resident in the United States may be sued in any judicial district."  And both the Third and Ninth Circuits have relied on *Brunette* and that longstanding rule in finding that the Clayton Act's venue and service clauses operate independently with respect to foreign defendants.  *See Go-Video*, 885 F.2d at 1409-10; *In re Auto. Refinishing Paint*, 358 F.3d at 296-97.  That conclusion gives effect to Congress' crystal-clear statement that "[f]or all venue purposes," aliens "may be sued in any judicial district."  28 U.S.C. §1391(c)(3).  And it eliminates any tension between the Clayton Act and the specific rules addressing venue over aliens, while avoiding the rather bizarre conclusion that in going out of its way to make it atypically easy to sue domestic antitrust violators Congress simultaneously made it atypically hard to sue alien antitrust violators.  *Cf. Go-Video*, 885 F.2d at 1409 ("[A]s a general matter, courts have interpreted special venue provisions to supplement, rather than preempt,

45

general venue statutes"). For all those reasons, embracing the independent approach to the Clayton Act's venue and service clauses as to alien defendants coheres with the courts' "role to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991).

The district court's contrary reading rests on a misreading of the key statutory language. The district court took "such cases" to refer only to the subset of antitrust actions in which venue is established pursuant to Section 12. ROA.2434. But as courts and treatise writers have recognized, that "analysis is suspect": The provision "refers instead to cases that are brought under the antitrust laws against corporations and says only that they *may* be brought in the stated venues." Wright & Miller §3818. Even some courts that have sided with the district court (in cases involving only domestic defendants) have recognized that the textual argument faces difficulties because the provision "does not speak of antitrust cases against corporations that 'are brought' in those districts." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 729 (7th Cir. 2013).

The district court recognized that problem, but thought adopting X's reading would "miss the forest for the trees." ROA.2434. On its view, adopting the independent reading of the clauses would render the venue clause superfluous. ROA.2435. According to the district court, if personal jurisdiction over a corporate defendant in an antitrust suit is proper everywhere, then the venue provision would

serve no purpose, as (on its view) other venue provisions would do all the work it ever could. *See* ROA.2434-35 (discussing §1391(b)). But, with respect, it is the district court that has lost the forest for the trees, by ignoring the historical evolution of the venue provisions. The Clayton Act was a pioneering effort by the federal government to tackle practices that posed unique problems for the national economy. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 127 (1983). Given the nascent state of other venue provisions at the time, Section 12 was enacted to make it relatively easy to hold out-of-state corporations to account and certainly was not superfluous when enacted. Section 12 "was enacted in 1914, decades before Congress expanded the general venue provisions through" amendments in the late 1980s, so when "enacted, the special venue provisions contained therein served a very definite purpose." *Icon Indus. Controls Corp. v. Cimetrix, Inc.*, 921 F.Supp. 375, 382-83 (W.D. La. 1996). Thus the language of the provision as originally enacted was far from redundant, and if later amendments to more general venue statutes leveled up those general provisions such that the specific 1914 antitrust clause now looks "redundant," *Go-Video*, 885 F.2d at 1413, that choice "was the prerogative of Congress," *Icon Indus.*, 921 F.Supp. at 383. Moreover, because the original purpose of the clause was to broaden the then-extant venue rules to make it easier to vindicate the antitrust laws, it would be not just wrong, but perverse, to use the canon against superfluity, which is never more than a rule of thumb, *see* A. Scalia

47

& B. Garner, *Reading Law* 176-77 (2012), to justify making it harder to sue alien corporations over antitrust violations than to sue them for other infractions.

**B.    The District Court Had Personal Jurisdiction Over Shell International Under Rule 4(k)(2).**

The district court erred in finding it lacked personal jurisdiction over Shell International.  As relevant here, Rule 4(k)(2) provides that, for a claim arising under federal law, personal jurisdiction exists "if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. R. 4(k)(2).  The district court rightly concluded that X's claims arose under federal law (the Sherman Act) and that, because Shell International had not conceded it was subject to personal jurisdiction in any state's courts, it should be treated as if not subject to any state's personal jurisdiction.  ROA.2414 (citing *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004)).  The only question, then, was whether the Fifth Amendment's Due Process Clause permitted the district court to exercise jurisdiction over Shell International.  ROA.2414.

The answer is yes.  Just last year, the Supreme Court made clear that the Fifth Amendment's Due Process Clause does not contain a minimum-contacts requirement akin to the Fourteenth Amendment's. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 23 (2025).  And while the Court assumed some degree of "reasonableness" might be constitutionally required, it reserved that question, *id.*,

while declining to delineate "the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts" (if any), *id.* at 19.  Instead, the Court recognized the "exceedingly compelling interest" in providing American victims of international terrorism a forum for their claims, and that under the circumstances, the Court held that requiring defendants to litigate such claims in American courts could hardly be called unfair.  *Id.* at 24.

Recognizing that *Fuld* had rejected a minimum contacts requirement and left much else open, the district court suggested that the question distilled to whether defendants engaged in "the jurisdiction-triggering conduct that Congress specified," ROA.2417, and that defendants who have engaged in conduct "closely connected" to the United States can be brought into American courts.  ROA.2418.

On that view, Shell International should have been subject to the district court's jurisdiction.  Shell International admitted to being a member of GARM.  And X plausibly alleged that members of GARM (including Shell) colluded to boycott X.  *See, e.g.*, ROA.516-18.  So, Shell International's admission of GARM membership, coupled with Shell's elimination of domestic purchases and reduction in international purchases of advertising, sufficed to link it to the conspiracy, and such conspiracies lie at the heart of the "jurisdiction-triggering conduct" the Sherman Act.  *See* 15 U.S.C. §1.  That is particularly true of group boycotts targeting a U.S. company like X, as such conduct is plainly "closely connected" to the United

States.   The conspirators inflicted billion-dollar harms on X—an American company—while distorting the digital-media advertising market, including in the United States.  *See, e.g.*, ROA.487; ROA.529.  And courts have recognized "the time-honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269 (2d Cir. 2023); *see id.* at 269-70.[8]  All of that should have brought Shell International well within the district court's reach.

The district court reached the contrary conclusion on the ground that GARM membership was not enough to tie Shell International to the conspiracy on the theory that "GARM membership or affiliation does not equate to boycotting X," as not all GARM members joined in every boycott GARM led and GARM did more than just boycott X.  ROA.2422.  But none of that exculpates Shell International or renders implausible X's allegations that Shell International (along with its corporate affiliates) actively participated in the conspiracy, including by ceasing all ad

---

[8] This Court has not yet expressly adopted the theory of conspiracy jurisdiction in the antitrust context, but in *Guidry v. U.S. Tobacco Co.*, the Court spent multiple pages instructing the district court on how to apply the theory on remand—discussion that would have been pointless if the Court thought the theory meritless. *See* 188 F.3d 619, 632-33 (5th Cir. 1999).  And the Court has long embraced a "co-conspirator theory" of jurisdiction in the parallel context of conspiracies to violate the securities laws. *See Hilgeman v. Nat'l Ins. Co. of Am.*, 547 F.2d 298, 302 & n.12 (5th Cir. 1977); *Luallen v. Higgs*, 277 F.App'x 402, 405 n.2 (5th Cir. 2008) (per curiam).  Here, X alleged numerous domestic acts in furtherance of the boycott. *E.g.*, ROA.494-95; ROA.531-32.

purchases from Twitter (or X) in the United States after November of 2022 in parallel with other co-conspirators and playing a leadership role in another group that promoted GARM membership and GARM's Brand Safety Standards. *See* ROA.503-04; ROA.493; ROA.531-32. At most, the observation that not every GARM member joined the conspiracy means that there are two plausible competing inferences to be drawn. That resolves this issue: Courts "are not authorized or required to determine whether the plaintiff's plausible inference … is equally or more plausible than other competing inferences." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009). And that is especially so given X's allegations and Shell International's GARM membership and economic incentives to join the conspiracy. *See, e.g.*, ROA.493; ROA.503-04; ROA.531-32; *see also* ROA.494; ROA.510; ROA.531-33 (allegations respecting the "Advertiser Defendants," which includes Shell, *see* ROA.494). The most plausible inference—and surely *a* plausible inference—is that Shell International followed GARM's rules and boycotted X.

Nor does it matter that GARM did more than simply organize boycotts. The Associated Press has a host of legitimate functions; yet its decision to publish bylaws nevertheless violated antitrust laws by prohibiting members from dealing with nonmembers. *See Associated Press v. United States*, 326 U.S. 1, 9, 15-19 (1945). *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980), is in the same vein. That case involved the rules of a multiple listing service, or an "MLS"—

51

essentially a service that allows realtors to share property listings, in that case through a monthly publication and daily updates on listings. See *id.* at 1355-56. An MLS has many legitimate rules and purposes. But in *Realty Multi-List*, this Court found the MLS members' agreement to the rules of the MLS satisfied the element of concerted action as to the specific restraint challenged by the plaintiff. *See* 629 F.2d at 1361 n.20 ("The concerted action necessary to establish a Section 1 violation exists in the agreement of [the MLS's] members to adopt and apply these rules and membership criteria."). Under *Associated Press* and *Realty Multi-List*, the admission by Shell International that it was a GARM member—particularly when coupled with the dramatic reduction in Shell's advertising spend in parallel with other GARM members and all the evidence detailed above of a GARM-member conspiracy to boycott Twitter—should have sufficed to render X's allegations plausible, with the ultimate validity of the plausible allegations left to actual adversarial testing.

While all of this renders it unnecessary for this Court to reach the ultimate question reserved in *Fuld*, if the Court feels the need to reach it, it should hold that the Fifth Amendment's Due Process Clause poses no relevant barrier to Congress extending personal jurisdiction over foreign actors who conspire to violate our nation's antitrust laws, *see Fuld*, 606 U.S. at 25-45 (Thomas, J., concurring in the judgment); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106

52

Va. L. Rev. 1703 (2020). While extending jurisdiction to foreign defendants may raise diplomatic issues, those issues are best left to the political branches, not case-by-case judicial improvisation. And given the Sherman Act's global reach, *see Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("[T]he Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."), exercise of jurisdiction over Shell International was proper.

## C. The District Court Further Erred in Denying Jurisdictional Discovery.

At a bare minimum, the district court should have granted jurisdictional discovery. "If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts," then "the plaintiff's right to conduct jurisdictional discovery should be sustained." *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 902 (5th Cir. 2024). Unless "the plaintiff's claim is clearly frivolous," "courts are to assist the plaintiff by allowing jurisdictional discovery." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003). And if the parties' battle over jurisdiction "raises issues of fact," discovery should be granted. *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982).

Doing so would have been especially appropriate here. X sought limited discovery as to Shell International, Lego A/S, and Nestle SA's "contacts with the United States and this District, particularly as they relate to their involvement in

53

WFA/GARM and the boycott of X." ROA.1772. Requesting discovery to that end made eminent sense—while Shell and Ørsted, to their credit, acknowledged which members of their corporate families were involved in GARM, Nestle SA and Lego A/S merely denied that they were GARM members while refusing to supply any information as to which of their corporate family members were members—and some undoubtedly were, as publicly available materials from WFA indicated that entities associated with "Nestle" and "Lego" played a significant role in WFA and GARM. *See* ROA.1786; ROA.1802-41. Yet, on the district court's misguided theory, a plaintiff categorically cannot get jurisdictional discovery related to "the impermissible inquiry of figuring out who in the corporate family was involved" in a conspiracy, even when one (or more) family member undoubtedly participated. ROA.2429-30.

That approach creates a gross asymmetry between American plaintiffs and foreign companies with opaque corporate structures. For instance, the district court found that it lacked jurisdiction over Shell International because "the evidence before the Court shows that Shell International does not perform any conduct in the United States." ROA.2421. But without some discovery into Shell International's operations and its relationships to other members of its corporate family, *cf.* ROA.493, it is hard to see how a plaintiff like X can test such factual assertions. Presumably that is why this Court has recognized that "[d]iscovery on matters of

54

personal jurisdiction … need not be permitted *unless the motion to dismiss raises issues of fact*." *Wyatt*, 686 F.2d at 284 (emphasis added). And the secretive nature of conspiracies may make jurisdictional discovery especially necessary. After all, most "every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world." *Grunewald v. United States*, 353 U.S. 391, 402 (1957).

Here, for example, for corporate families that share a common brand name and logo—often the only public information about GARM's membership—X had no way, absent discovery, to determine which corporate member participated in GARM. *See* ROA.1774-77. The district court's approach thus creates perverse incentives for foreign companies to play corporate-identity shell games. And while the district court denigrated X's request as a "fishing expedition," ROA.2429, asking which corporate entity was a member when there is no denying that some branch of the corporate family tree participated is hardly a fishing expedition. Indeed, courts often grant jurisdictional discovery when complex issues of corporate structure are at issue. *See, e.g.*, *Next Techs., Inc. v. ThermoGenisis, LLC*, 121 F. Supp. 3d 671, 679 (W.D. Tex. 2015); *Doucet v. Abbott Lab'ys, Inc.*, 2025 WL 1548534, at \*4 (E.D. La. May 29, 2025) (allowing "at least some discovery" because "Abbott's corporate structure appears to be factually complex").

"In an appropriate case," this Court has said, "we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that the plaintiff was improperly denied discovery." *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1137 (5th Cir. 1987). This is an appropriate case; X should have been allowed jurisdictional discovery.

## CONCLUSION

This Court should reverse the dismissal of X's complaint and the grant of the motions to dismiss for lack of personal jurisdiction and the denial of jurisdictional discovery. Alternatively, it should vacate the with-prejudice dismissal of X's claims and remand for further proceedings.

Respectfully submitted,

s/Paul D. Clement

CHRISTOPHER G. RENNER
JONATHAN M. SHAW
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave., Suite 608
Alexandria, VA 22314
(415) 433-1700

PAUL D. CLEMENT
 *Counsel of Record*
JAMES Y. XI[*]
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant X Corp.*

August 5, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

August 5, 2026

s/Paul D. Clement
Paul D. Clement