# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

X CORP.,

*Plaintiff-Appellant/Cross-Appellee*,

v.

WORLD FEDERATION OF ADVERTISERS,

*Defendant-Appellee/Cross-Appellant*,

and

MARS, INCORPORATED, *et al.*,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the Northern District of Texas
No. 7:24-CV-114 (Hon. Jane J. Boyle)

## BRIEF OF AMICI CURIAE STATE OF WEST VIRGINIA
## AND 11 OTHER STATES IN SUPPORT OF
## PLAINTIFF-APPELLANT/CROSS-APPELLEE & REVERSAL

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*

HOLLY J. WILSON
*Principal Deputy Solicitor General*
*Counsel of Record*

ZACHARY A. VIGLIANCO
*Director of Strategic Litigation*

CALEB A. SECKMAN
*Assistant Solicitor General*

*Counsel for Amicus Curiae State of West Virginia*
[additional counsel listed after signature page]

# TABLE OF CONTENTS

Introduction & Interests Of Amici Curiae.................................................................1

Summary Of The Argument......................................................................................3

Argument....................................................................................................................5

    I.     The district court erred in dismissing Shell International, Lego A/S, and Nestlé S.A. for lack of personal jurisdiction.....................................5

        A.     The Fifth Amendment—not the Fourteenth Amendment—governs here. ...........................................................................6

        B.     The Fifth Amendment imposes no territorial limit on federal personal jurisdiction. ...........................................................10

        C.     Even if the Fifth Amendment does limit personal jurisdiction, it would impose a minimal burden that's easily met here................14

    II.    The district court erred in dismissing Ørsted for lack of personal jurisdiction. ..........................................................................................17

    III.   Narrowing jurisdiction over foreign defendants harms the States....22

Conclusion................................................................................................................26

Certificate Of Compliance.......................................................................................29

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*In re Blue Cross Blue Shield Antitrust Litig.*,
26 F. Supp. 3d 1172 (N.D. Ala. 2014)................................................18

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
582 U.S. 255 (2017).........................................................................8

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*,
406 U.S. 706 (1972)........................................................................22

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)........................................................................23

*Burnet v. Brooks*,
288 U.S. 378 (1933)..........................................................................9

*Denezpi v. United States*,
596 U.S. 591 (2022)........................................................................21

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) ..............................................1, 9, 10, 17

*EEOC v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991)........................................................................23

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)..............................................................6, 21, 25

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)..........................................................7, 8, 15, 23

*Fuld v. Pal. Liberation Org.*,
101 F.4th 190 (2d Cir. 2024)............................................................10

*Fuld v. Pal. Liberation Org.*,
606 U.S. 1 (2025).................................. 1, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20

*Georgia v. Penn. R.R. Co.*,
324 U.S. 439 (1945) ................................................................25

*Go-Video, Inc. v. Akai Elec. Co.*,
885 F.2d 1406 (9th Cir. 1989) .............................................19

*Hall v. Trivest Partners, L.P.*,
178 F.4th 986 (6th Cir. 2026) ..............................................12

*Hanson v. Denckla*,
357 U.S. 235 (1958) .................................................................7

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993) .................................................................5

*Holmes v. Jennison*,
39 U.S. (14 Pet.) 540 (1840) ................................................24

*Huntington v. Attrill*,
146 U.S. 657 (1892) ............................................................3, 23

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ...........................................................7, 23

*J. McIntyre Mach., Ltd. v. Nicastro*,
564 U.S. 873 (2011) .............................................................7, 9

*Jesner v. Arab Bank, PLC*,
584 U.S. 241 (2018) ...............................................................13

*King v. Bon Charge*,
823 F. Supp. 3d 508 (D. Del. 2025) ....................................10

*Lewis v. Mutond*,
62 F.4th 587 (D.C. Cir. 2023) ..............................................10

*Lightfoot v. Cendant Mortg. Corp.*,
580 U.S. 82 (2017) ...................................................................6

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
334 U.S. 219 (1948) ..........................................................25, 26

*Massachusetts v. EPA*,
  549 U.S. 497 (2007).............................................................24

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. (18 How.) 272 (1856)...........................................21

*N.Y. Life Ins. Co. v. Head*,
  234 U.S. 149 (1914)...........................................................23

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*,
  470 U.S. 451 (1985)...........................................................21

*Picquet v. Swan*,
  19 F. Cas. 609 (C.C.D. Mass. 1828)...................................11

*Rumble, Inc. v. World Fed'n of Advertisers*,
  No. 24-cv-115, 2025 WL 2345076 (N.D. Tex. Aug. 13, 2025).....................18

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)...........................................................23

*Toland v. Sprague*,
  37 U.S. 300 (1838).............................................................12

*United States v. Bennett*,
  232 U.S. 299 (1914)...........................................................13

*United States v. Nat'l City Lines*,
  334 U.S. 573 (1948)...........................................................20

*United States v. Pink*,
  315 U.S. 203 (1942)...........................................................13

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)...........................................................25

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983)...........................................................13

*Zschernig v. Miller*,
  389 U.S. 429 (1968)...........................................................24

**Constitutional Provisions**

U.S. Const. art. I, § 8 .................................................................................11

**Statutes**

15 U.S.C. § 1 .............................................................................................5

15 U.S.C. § 6a .............................................................................................6

15 U.S.C. § 22 .................................................................................2, 4, 5, 18

28 U.S.C. §1391 .................................................................................20, 21, 22

W. Va. Code § 47-18-1 *et seq.* .................................................................25

**Other Authorities**

Geoffrey P. Miller,
  *In Search of the Most Adequate Forum: State Court Personal
  Jurisdiction,*
  2 Stan. J. Complex Litig. 1 (2014). ...............................................8

Nathan S. Chapman,
  *Due Process Abroad,*
  112 Nw. U. L. Rev. 377 (2017).......................................................11

Robert D. Brussack,
  *Political Legitimacy and State Court Jurisdiction: A
  Critique of the Public Law Paradigm,*
  72 Neb. L. Rev. 1082 (1993) ..........................................................13

Stephen E. Sachs,
  *The Unlimited Jurisdiction of the Federal Courts,*
  106 Va. L. Rev. 1703 (2020) ....................................................12, 14

Wright & Miller's Federal Practice & Procedure
  (4th ed. 2025) ..................................................................19, 20, 22

## INTRODUCTION & INTERESTS OF AMICI CURIAE

For decades, courts had assumed that the Fourteenth Amendment minimum contacts framework, which governs personal jurisdiction in *state* courts, also constrained *federal* courts under the Fifth Amendment. *E.g.*, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022). Last year, however, the Supreme Court rejected that assumption. *See Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 16 (2025). The Fifth Amendment, the Court held, "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* Lower courts must now decide, for the first time, what that standard requires and where it stops.

This case tees up these new Fifth Amendment issues. X Corp. sued a group of foreign advertisers and trade organizations under the Sherman and Clayton Acts, alleging that they conspired to organize a boycott that cost X billions of dollars in advertising revenue. The district court recognized that the Fourteenth Amendment's minimum contacts standard no longer governs, yet it nevertheless reintroduced much of that same standard through the back door. It then dismissed three foreign defendants for lack of "jurisdiction-triggering conduct" closely connected to the United States, layering on an

1

"unreasonable and unfair" inquiry the Fifth Amendment does not require. ROA.2417 (cleaned up). Adding statutory insult to constitutional injury, the court also employed a cramped reading of Section 12 of the Clayton Act, the venue and service provision, to dismiss a fourth foreign defendant, Ørsted. *See* 15 U.S.C. § 22.

This Court should correct both errors. *First*, the Fifth Amendment standard imposes no territorial limit on personal jurisdiction. At most, it might require notice and an opportunity to be heard, which the ordinary safeguards of federal civil litigation ensure will happen. To the extent the Fifth Amendment might require a reasonableness inquiry, that test has no fairness component—let alone a strict requirement of close contact with the United States. So, the district court got it wrong under any standard. *Second*, Section 12's text contains two clauses that should be read independently, not as an integrated whole. X can employ the provision allowing for nationwide service of process even if it's not also making use of Section 12's special venue clause for antitrust cases.

Allowing these errors to stand would harm the Amici States. States sometimes depend on federal courts to redress injuries that foreign actors inflict because the States' courts often cannot. A State's laws "have no force

of themselves beyond the jurisdiction of the State which enacts them," *Huntington v. Attrill*, 146 U.S. 657, 669 (1892). When federal courts narrow their own reach over foreign wrongdoers, they do not merely limit federal power—they may also close the only forum in which States, their residents, and their businesses can obtain relief.

Altogether, the decision below reimposes an illusory constitutional limit that the Supreme Court has repudiated and narrows an express statutory grant that Congress wrote broadly. This Court should reverse.

## SUMMARY OF THE ARGUMENT

**I.** The Fifth Amendment, not the Fourteenth, governs the district court's exercise of personal jurisdiction in this case. And the Supreme Court has held that the Fifth Amendment does not contain a minimum contacts test, as that test advanced the Fourteenth-Amendment-specific purpose of protecting fairness and federalism. The Supreme Court has not delineated the Fifth Amendment's restrictions on personal jurisdiction, but history provides the answer: it has none. If the Fifth Amendment includes any restraints, it merely requires that foreign defendants be given notice and an opportunity to be heard in an unbiased forum. And any potential reasonableness test should not contain a fairness requirement, which is a fundamental part of the

3

Fourteenth Amendment rubric—the one the Supreme Court disclaimed.  So, the district court erred by applying any Fifth Amendment limitation at all.  But if this Court decides that a test does exist, it isn't the one the district court created.  So, the court erred in dismissing Shell International, Lego A/S, and Nestlé S.A. for lack of personal jurisdiction.

**II.**   The district court committed an independent error in dismissing Ørsted.  That foreign defendant conceded personal jurisdiction in New York, so the jurisdictional analysis turns entirely on Section 12 of the Clayton Act, which authorizes suit against any corporation "wherever it may be found."  15 U.S.C. § 22.  The district court thought Section 12's grant was available only once the Act's separate venue clause is satisfied—integrating the venue and personal jurisdiction clauses together.  But the statute's text, history, and purpose all prevent that reading.  They confirm the two clauses are independent.  And properly read, the district court should not have dismissed Ørsted under Section 12.

**III.**   The district court's errors harm the States.  In our federalist system, States often depend on federal courts to carry the water when foreign defendants are involved.  So in many of those cases, if a federal court doesn't have jurisdiction, Americans, and the States whose residents and economies

4

they represent, lose any avenue for relief.  Antitrust cases, like this one, are a perfect example.  Where foreign anticompetitive conduct inflicts direct harm on American markets, businesses, and workers, the federal courts provide critical enforcement.

## ARGUMENT

### I.  The district court erred in dismissing Shell International, Lego A/S, and Nestlé S.A. for lack of personal jurisdiction.

Congress gave the antitrust laws sweeping, extraterritorial reach.  The Sherman Act reaches restraints of trade "among the several States, or with foreign nations."  15 U.S.C. § 1.  And the Clayton Act authorizes antitrust suits against any corporation "wherever it may be found."  *Id.* § 22.  Applying that text, the Supreme Court has held it is "undoubtedly" true that a federal court can hear antitrust claims against a foreign corporation and that international comity doesn't bar that result where foreign conduct produces a substantial domestic effect.  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795-99 (1993).

Congress narrowed that expansive reach only once, in 1982, when it excluded from the antitrust laws conduct causing *purely* foreign injury— leaving untouched federal courts' power to protect American consumers and businesses from foreign anticompetitive conduct that harms them here.  *See*

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a; *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169 (2004) (explaining that the FTAIA was meant only "to clarify, perhaps to limit," not foreclose, antitrust law's reach over foreign commerce). Congress, in short, wanted federal courts to reach foreign antitrust defendants who harm Americans.

For Shell International, Lego A/S, and Nestlé S.A., the only question is whether the Constitution stands in the way. It does not. The Fifth Amendment, not the Fourteenth, governs here. And it imposes no restriction on federal personal jurisdiction. But even if the Fifth Amendment imposes some limit, that limit is minimal. It's also not the fairness-based "reasonableness" test the district court imagined. So exercising jurisdiction over Shell International, Lego A/S, and Nestlé S.A. here is consistent with whatever the Fifth Amendment requires.

## A. The Fifth Amendment—not the Fourteenth Amendment—governs here.

A "court must have … power over the parties before it (personal jurisdiction) before it can resolve a case." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017).

In state courts, the Fourteenth Amendment's Due Process Clause limits the scope of personal jurisdiction. *See generally Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) (citing, *inter alia*, *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). The inquiry requires "minimum contacts," which measure the "defendant's relationship to the forum State." *Ford*, 592 U.S. at 358 (cleaned up). A forum may exercise specific jurisdiction over a nonresident defendant only if the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum," such that it has "submit[ted] to the judicial power" of that State. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (plurality op.) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The defendant must have had sufficient contact with the forum State so that maintaining the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (cleaned up).

The "minimum contacts" test makes sense for state courts. The Fourteenth Amendment's jurisdictional standards are "a consequence of territorial limitations on the power of the respective States." *Hanson*, 357 U.S. at 251. And the "minimum contacts" requirement serves the Fourteenth Amendment's twin aims of "treating defendants fairly and protecting

interstate federalism." *Ford*, 592 U.S. at 360 (cleaned up); *see also Fuld*, 606 U.S. at 13-14; *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 263 (2017) ("[T]he [Fourteenth Amendment's] Due Process Clause, *acting as an instrument of interstate federalism*, may sometimes act to divest the State of its power to render a valid judgment." (emphasis added) (cleaned up)). What's more, "[t]he minimum contacts requirement also serves as a proxy for the interest of the forum state."  Geoffrey P. Miller, *In Search of the Most Adequate Forum: State Court Personal Jurisdiction*, 2 STAN. J. COMPLEX LITIG. 1, 8 (2014).

But this case involves federal courts and federal statutes providing for personal jurisdiction, not state ones.  The Fourteenth Amendment's protections therefore fall away, leaving the Fifth Amendment in their stead. *Fuld*, 606 U.S. at 16.  "Any difference between the Fifth and Fourteenth Amendments is therefore implicated in only a subset of federal cases, such as those in which personal jurisdiction is … authorized by a federal statute." *Id.* at 11.  And though the text of both is "the same," the standards imposed under either can and do diverge sometimes. *Id.* at 13 (cleaned up).  This case presents one of those times.  Because the Fifth Amendment applies to the federal sovereign rather than a State, it "necessarily permits a more flexible

8

jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 16. The Fourteenth Amendment's minimum contacts standard—the standard serving fairness and interstate federalism—has no hold under the Fifth Amendment. *Id.* Fifth Circuit precedent saying otherwise is no longer good law. *See Douglass*, 46 F.4th at 235.

Unlike the States, which are bound by "territorial limitations" on their power, "the Constitution confers upon the Federal Government—and it alone—both nationwide and extraterritorial authority." *Fuld*, 606 U.S. at 15. The "interstate federalism concerns" that cabin state jurisdiction thus "do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* As the Supreme Court has put it in an analogous context, "[t]he Constitution creates no such relation between the United States and foreign countries as it creates between the states themselves." *Burnet v. Brooks*, 288 U.S. 378, 405 (1933). And "[b]ecause the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State." *Nicastro*, 564 U.S. at 884. The "proxy" function of minimum contacts also proves unnecessary in federal court, as federal subject-matter jurisdiction ensures the existence of a genuine federal interest.

So the Fourteenth Amendment's minimum contacts framework is beside the point where, as here, the Fifth Amendment controls.

**B. The Fifth Amendment imposes no territorial limit on federal personal jurisdiction.**

Despite all this, the district court concluded that some version of the Fourteenth Amendment's fairness-based "minimum contacts" inquiry still governs. That conclusion was wrong. The Fifth Amendment imposes no such limitation—or any limitation, for that matter. *See, e.g., Fuld v. Pal. Liberation Org.*, 101 F.4th 190, 217 (2d Cir. 2024) (Menashi, J., dissenting from denial of rehearing en banc) (collecting authorities showing that "the Fifth Amendment does not impose such limits").

The Fifth Amendment, "as originally understood," places "no[]" "boundar[y] … on the Federal Government's power to extend personal jurisdiction over [a defendant]." *Fuld*, 606 U.S. at 26 (Thomas, J., concurring in the judgment); accord *Douglass*, 46 F.4th at 255 (Elrod, J., dissenting) ("The text, history, and structural implications of the Fifth Amendment Due Process Clause suggest that its original public meaning imposed few (if any) barriers to federal court personal jurisdiction."); *Lewis v. Mutond*, 62 F.4th 587, 598 (D.C. Cir. 2023) (Rao, J., concurring); *King v. Bon Charge*, 823 F. Supp. 3d

508, 523 (D. Del. 2025) ("Historically, the Fifth Amendment was not viewed as limiting federal courts' own assertions of personal jurisdiction.").

The Constitution and Congress's actions post-ratification are proof positive. Article I provides that Congress may "define and punish Piracies and Felonies committed on the high Seas," and "make Rules concerning Captures on Land and Water." *Fuld*, 606 U.S. at 35 (Thomas, J., concurring in the judgment) (quoting U.S. CONST. art. I, § 8, cls. 10, 11). The First Congress exercised this authority in the Judiciary Act of 1789, granting federal courts jurisdiction over admiralty and maritime cases arising "upon the high seas." *Id.* at 35-36 (cleaned up). Indeed, "[o]ne of the federal government's top priorities" after the founding was "[t]he prosecution and punishment of extraterritorial crimes, including crimes committed by aliens." *Id.* at 36 (quoting Nathan S. Chapman, *Due Process Abroad*, 112 NW. U. L. REV. 377, 409 (2017)).

Consistent with that broad remit, early federal jurists, like Justice Story, did not see any constitutional limit on Congress's ability to extend federal court jurisdiction to just about any defendant worldwide. *See Picquet v. Swan*, 19 F. Cas. 609, 613-15 (C.C.D. Mass. 1828) (Story, J.) (explaining that courts would be "bound to follow" a congressional mandate that they extend

11

jurisdiction to "an alien, who has never been within the United States" based on nearly non-existent contacts). Restraints on federal court reach came from Congress, not the Constitution.

Supreme Court precedent points this way, too. *See Hall v. Trivest Partners, L.P.*, 178 F.4th 986, 991 (6th Cir. 2026) (Kethledge, J.) ("[T]he Supreme Court has not identified any limits, under the Fifth Amendment, on the personal jurisdiction of the federal courts."). Early on, the Court thought Justice Story's reasoning had "great force." *Toland v. Sprague*, 37 U.S. 300, 328 (1838). Later, *no* early Supreme Court rulings applied the Fifth Amendment to personal jurisdiction disputes; in fact, it was "not until the Civil War [that] a single court, state or federal, [would] hold a personal-jurisdiction statute invalid on due process grounds." Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703, 1712 (2020). And the Supreme Court would go on to recognize during the *Lochner* era—when it was busy erecting Fourteenth Amendment limits on the States—that the Fifth Amendment supplies "no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting [the federal] government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *Fuld*, 606 U.S. at 41

(Thomas, J., concurring in the judgment) (quoting *United States v. Bennett*, 232 U.S. 299, 306 (1914)).

Beyond history and precedent, the conclusion that the Fifth Amendment doesn't contain a territorial limit also "respects [courts'] deferential approach to the political branches' delicate judgments in foreign affairs." *Fuld*, 606 U.S. at 44-45 (Thomas, J., concurring in the judgment) (cleaned up). When and against whom to extend federal jurisdiction over foreign defendants is the kind of "delicate judgment[] ... that is the prerogative of the political branches to make." *Id.* at 42 (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 273 (2018)). Indeed, "Congress has the undisputed power to decide ... whether and under what circumstances foreign nations should be amenable to suit in the United States." *Id.* at 42-43 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983)). In other words, our national legislative body has a clearer political legitimacy in acting against aliens. *See* Robert D. Brussack, *Political Legitimacy and State Court Jurisdiction: A Critique of the Public Law Paradigm*, 72 NEB. L. REV. 1082, 1086 (1993). And this "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942).

Congress has already exercised that power here, through the Clayton Act's and Sherman Act's deliberately broad jurisdictional text.

Because the Fifth Amendment imposes no limit at all, the district court was wrong to apply a test for jurisdiction beyond the statute.

### C. Even if the Fifth Amendment does limit personal jurisdiction, it would impose a minimal burden that's easily met here.

If any Fifth Amendment limit on personal jurisdiction does exist, it is basic, and it is met here. The district court's fairness-based "reasonableness" test is not the right standard, and the court erred by employing it to dismiss X's claims.

At most, the court should consider only whether personal jurisdiction would deprive the defendants "of an independent judge, regular allegations, opportunity to answer, or a trial according to some settled course of judicial proceedings." *Fuld*, 606 U.S. at 45 (Thomas, J., concurring in the judgment) (cleaned up). The Fifth Amendment due process inquiry should "end[] there." *Id.* at 45; *see also*, *e.g.*, Sachs, *supra*, at 1709-10 ("Due process may still require that defendants receive adequate notice, that the forum not be so burdensome as to render the proceedings a sham, and so on. But as to the scope of the courts' territorial jurisdiction, the Clause has nothing to say." (cleaned up)). Using that test, personal jurisdiction over the foreign defendants is

permissible.  Every defendant received service of process, appeared through counsel, filed declarations and briefing contesting jurisdiction at length, and had its arguments resolved by an Article III judge following the ordinary course of federal civil proceedings.  The facts meet the constitutional floor.

To be sure, the Supreme Court has pondered whether the Fifth Amendment "might entail a similar inquiry [to the Fourteenth Amendment] into the reasonableness of the assertion of jurisdiction in the particular case." *Fuld*, 606 U.S. at 23 (cleaned up).  It doesn't—but if it did, that reasonableness inquiry would not encode a fairness-to-the-defendant element.  Again: the Fourteenth Amendment's minimum contacts standard exists to serve fairness toward the defendant and federalism.  *Ford*, 592 U.S. at 360.  Because those interests apply differently when it comes to federal courts, the Supreme Court has excised minimum contacts from any Fifth Amendment test.  *Fuld*, 606 U.S. at 16.  In doing so, the Court necessarily shelved the values that standard was built to serve—fairness included, not just federalism.  *See id.*  And to whatever extent fairness for foreign defendants mattered to early jurisdictional practice, it would have mattered not in the constitutional context, but as it related to "general principles of international law."  *Id.* at 35 (Thomas, J., concurring in the judgment).  Of course, Congress could always override those

fairness considerations by clear statutory command, too, "no matter how unjust" the result. *Id.* at 40 (Thomas, J., concurring in the judgment) (cleaned up); *see id.* at 36-40 (discussing international law paradigm).

Accordingly, a Fifth-Amendment-specific reasonableness test should at least exclude "the burden on the defendant." *Fuld*, 606 U.S. at 24 (cleaned up). It might require looking at "the interests of the forum" and "the plaintiff's interest in obtaining relief"—but no more. *Id.* (cleaned up). The "burden on the defendant" prong encodes the fairness inquiry for the foreign defendant— a requirement already disclaimed by the Supreme Court. And here, as the district court rightly recognized, the United States has a strong interest in the case and X has a deep interest in obtaining relief. ROA.2419-20.

Separately, the district court improperly read in a "jurisdiction-triggering conduct" rule. ROA.2414. The Supreme Court has created no such standard for Fifth Amendment due process. It has merely concluded that a statute that "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns" does not "transgress" whatever limits the Fifth Amendment imposes. *Fuld*, 606 U.S. at 18-19. So the district court mistook sufficiency for necessity. And in doing so, it converted what the Supreme Court has offered as one way of satisfying

16

the Constitution into the *only* way—and returned to the sort of contact-tallying that drove the Fifth Amendment analysis before *Fuld*. *See, e.g.*, *Douglass*, 46 F.4th at 235.

In the end, all this proves to be somewhat academic here, as the district court was wrong to dismiss Shell International, Lego A/S, and Nestlé S.A. under any of these three approaches (no limit, basic due process protections, or reasonableness). If it imposes only the minimal due process floor, that floor is satisfied here. And if it entails some Fourteenth Amendment-style reasonableness inquiry after all, that inquiry does not import a fairness component for foreign defendants. The district court should not have considered the burden on the defendants, and with that requirement gone, personal jurisdiction in this case would be reasonable. No matter what path this Court takes, it should reverse as to Shell International, Lego A/S, and Nestlé S.A.

## II. The district court erred in dismissing Ørsted for lack of personal jurisdiction.

Unlike the other foreign defendants, Ørsted conceded that it is subject to personal jurisdiction in New York—satisfying the district court's constitutional concern for some national contact. So personal jurisdiction over Ørsted turns on Section 12 of the Clayton Act. That section contains two

clauses separated by a semicolon: (1) a "special" venue clause permitting "[a]ny suit, action, or proceeding under the antitrust laws" to be brought "not only in the judicial district whereof [a corporation] is an inhabitant, but also in any district wherein it may be found or transacts business," and (2) a personal jurisdiction clause authorizing worldwide service for "such cases" "in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22.

Courts are split on how to read these two clauses. The Second, Seventh, and D.C. Circuits have read them as integrated; the Third and Ninth have read them as independent. *See Rumble, Inc. v. World Fed'n of Advertisers*, No. 24-cv-115, 2025 WL 2345076, at *6 (N.D. Tex. Aug. 13, 2025) (Boyle, J.). The district court took the former approach. ROA.2430-31. It held that the statute's personal jurisdiction clause activates only once its venue clause is independently satisfied, and the court dismissed Ørsted for failing to show it "inhabits, is found, or transacts business" in the Northern District of Texas.[*] ROA.2431. That holding was wrong for a host of reasons.

---

[*] At least one court has said that this conception mistakenly "characterize[s] the 'integrated' approach in reverse fashion." *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1194 n.22 (N.D. Ala. 2014). So it's not even clear that the district court applied the integrated approach correctly.

*First*, the integrated reading is "suspect." 14D WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3818 (4th ed. 2025). It requires reading "such cases" to refer back only to cases already brought in one of the venues the first clause specifies, rather than to "antitrust cases" as a class. *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1412 (9th Cir. 1989). But the ordinary rules of syntax cut the other way: "such" is presumed to refer back to the noun it modifies as that noun *actually appeared* earlier in the text. WRIGHT & MILLER'S, *supra*. The clause preceding the semicolon "does not contain a reference to cases that are brought in the approved venues." *Id.* It refers only to "cases that are brought under the antitrust laws" against a corporation, and "says only that they *may* be brought in the stated venues." *Id.* Reading "such cases" to smuggle in a venue limitation the preceding clause never states is "implausible." *Id.*

*Second*, the district court's integrated reading is also inconsistent with the Act's history and purpose. When Congress enacted the Clayton Act in 1914, "state long-arm statutes were unknown and amenability to process was viewed quite restrictively." WRIGHT & MILLER'S, *supra*. Section 12's venue clause did real, independent work in that world—it let a plaintiff sue a corporation wherever it "transacted business," even where the corporation

couldn't be "found" there under the doctrines of the day. *Id.* The district court acknowledged that Section 12 was designed to "broaden[] venue and personal jurisdiction" and has a "general purpose of broadening" federal jurisdiction over antitrust defendants. ROA.2433-34. Yet the court adopted a reading that makes the exercise of jurisdiction turn on the satisfaction of venue—when venue has always followed from jurisdiction. *Cf.* 28 U.S.C. § 1391(c)(2) (defining a defendant's residence, for venue purposes, as any district where the defendant is subject to personal jurisdiction). That backward construction *narrows* jurisdiction rather than broadening it. And so, it is "utterly inconsistent with the purpose of Congress in conferring the broader range of choice" that the Clayton Act's venue provisions were meant to secure, leaving no "room ... for judicial discretion to apply the doctrine of forum non conveniens so as to deprive the plaintiff of the choice given by the section." *United States v. Nat'l City Lines*, 334 U.S. 573, 588 (1948).

*Third*, reading Section 12's clauses as independent doesn't raise any due process problem that might justify narrowing the statute. Once jurisdiction is "authorized by a federal statute," the only limit on it is "the constitutionality of" the statute itself. *Fuld*, 606 U.S. at 11-12 (cleaned up). But the Clayton Act doesn't present any inherent due process concerns that might shrink its

20

jurisdictional reach. Nothing in the law interferes with a foreign defendant's ability to defend itself in court according to "settled usages and modes of proceeding." *Denezpi v. United States*, 596 U.S. 591, 617 (2022) (Gorsuch, J., dissenting) (cleaned up). Nor does the statute deprive foreign defendants of the benefit of an independent judge, or of "regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 280 (1856). The Clayton Act isn't "arbitrary and irrational" in a way that might violate due process, either. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 472 (1985) (cleaned up). "[F]oreign anticompetitive conduct" can cause "domestic antitrust injur[ies]." *Empagran*, 542 U.S. at 165. Thus, it is "reasonable" for Congress to curtail such conduct. *Id.*

*Fourth*, the district court's reading runs against general federal venue provisions. For instance, 28 U.S.C. § 1391(c)(2) defines a defendant's residency "[f]or *all* venue purposes" as any district in which the defendant is subject to personal jurisdiction. (emphasis added). In conjunction with the Clayton Act, this statute's plain text demonstrates that "venue and personal jurisdiction are proper in any judicial district" so long as that jurisdiction is

"in accordance with the Due Process Clause in the Fifth Amendment." WRIGHT & MILLER'S, *supra*. Likewise, Section 1391(c)(3) provides that "[f]or all venue purposes," "a defendant not resident in the United States may be sued in *any* judicial district." 28 U.S.C. § 1391(c)(3) (emphasis added). And this latter provision "leave[s] suits against alien defendants exempt from [other] venue statutes … in all" cases. *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 714 (1972).

At bottom, the district court deployed a jurisdiction-*broadening* statute to *limit* available venues and cabin personal jurisdiction. This backward application isn't grounded in the Clayton Act's text. It also defeats the statute's purpose. The Court should reverse as to Ørsted.

## III. Narrowing jurisdiction over foreign defendants harms the States.

The district court's decision harms the States and their citizens. In many cases, States must rely on federal courts to remedy harms inflicted by foreign actors, because state courts lack the tools to reach those actors. The district court's cramped view of personal jurisdiction closes off that avenue, and the States and their citizens bear the cost. Those consequences matter, as the Supreme Court has warned in the context of personal jurisdiction that rigid formalism and "talismanic jurisdictional formulas" should yield to real-

world consequences. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485 (1985).

The States have "significant interests" in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Ford*, 592 U.S. at 368 (cleaned up). But state court jurisdiction is limited to what is "reasonable, in the context of our federal system of government." *Int'l Shoe Co.*, 326 U.S. at 317. Those limits are real. State "[l]aws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extraterritorial effect only by the comity of other States" or foreign nations. *Huntington*, 146 U.S. at 669. "A State cannot punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003). Extraterritorial regulation by a State would "throw[] down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). The federal government and its courts face no such limitations. *See, e.g.*, *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("Both parties concede,

as they must, that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.").

That division of labor is by design. "When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). Among them: "foreign affairs and international relations," which the Constitution "entrusts solely to the Federal Government." *Zschernig v. Miller*, 389 U.S. 429, 436 (1968). Indeed, "[i]t was one of the main objects of the Constitution to make us, so far as regarded our foreign relations, one people, and one nation." *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 575 (1840).

So when a foreign actor inflicts injury that reaches into American markets, the States necessarily depend on the federal courts and federal laws to some degree to supply the remedies. Claims by Americans against foreign actors are often matters federal courts are best equipped to address. In those cases, without personal jurisdiction over foreign defendants in federal courts, the States get stripped of the forum through which their residents can obtain relief.

This case shows what is at stake. "Antitrust laws … are the Magna Carta of free enterprise" and "are as important to the preservation of

economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).  And in the Clayton Act, Congress chose to do so with a "comprehensive" scheme that "protect[s] all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948).  An anticompetitive conspiracy inflicts real harm on the "economy of [a State] and the welfare of [its] citizens"—it can "cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams," and can "stifle, impede, or cripple old industries and prevent the establishment of new ones." *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 450 (1945).

States have enacted their own antitrust laws to protect their citizens from exactly this harm.  *See, e.g.*, W. VA. CODE § 47-18-1 *et seq*.  But state antitrust law is concededly weaker here, for the same reasons state jurisdiction is limited generally: much of the conduct States need to reach—anticompetitive conduct organized and carried out by foreign actors—is precisely the conduct States are least equipped to address in their own state courts.  Yet it is "beyond doubt" that "foreign anticompetitive conduct" can cause "domestic antitrust injury." *Empagran*, 542 U.S. at 165 (cleaned up).

Federal antitrust law—vindicated in federal courts—offers a path to redress that injury.

The district court's decision closes that door. By reading the Fifth Amendment to impose the same fairness-based constraints that limit state courts, the district court has made it harder—for every future antitrust plaintiff, and by extension every State whose residents and businesses depend on functioning markets—to reach the foreign actors whose conduct injures them. That result cannot be squared with a statute Congress designed to give victims of anticompetitive conduct a remedy "by whomever" inflicted the harm. *Mandeville Island Farms*, 334 U.S. at 236.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

JOHN B. MCCUSKEY
  ATTORNEY GENERAL

/s/ Holly J. Wilson
Michael R. Williams
  *Solicitor General*

Holly J. Wilson
  *Principal Deputy Solicitor*
  *General*
  *Counsel of Record*

Zachary A. Viglianco
  *Director of Strategic Litigation*

Caleb A. Seckman
  *Assistant Solicitor General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021

Dated: August 12, 2026

*Counsel for Amicus Curiae*
*State of West Virginia*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

JAMES UTHMEIER
Attorney General
State of Florida

THEODORE E. ROKITA
Attorney General
State of Indiana

LYNN FITCH
Attorney General
State of Mississippi

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

CORI MILLS
Attorney General
State of Alaska

RAÚL R. LABRADOR
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JONATHAN SKRMETTI
Attorney General
State of Tennessee

# CERTIFICATE OF COMPLIANCE

1.      This amicus curiae brief complies with Fed. R. App. P. 29(a)(5) because it contains 5384 words.

2.      This amicus curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Holly J. Wilson
Holly J. Wilson