# United States Court of Appeals for the Fifth Circuit

X CORP.,

*Plaintiff-Appellant*,

v.

WORLD FEDERATION OF ADVERTISERS, *ET AL.*,

*Defendants-Appellees*,

On Appeal from the United States District Court for the
Northern District of Texas, Wichita Falls Division
No. 7:24-cv-00114-B, Hon. Jane J. Boyle

## BRIEF FOR *AMICUS CURIAE* PROFESSOR JOHN YUN IN SUPPORT OF APPELLANT AND REVERSAL

Gene C. Schaerr
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

Donald M. Falk
SCHAERR | JAFFE LLP
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

*Counsel for* Amicus Curiae

AUGUST 12, 2026

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

No. 26-10394
*X Corp. v. World Federation of Advertisers, et al.*

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record hereby certifies that, in addition to the persons and entities listed in the Appellant's Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>*Amicus Curiae*</u>:
Prof. John Yun

<u>Counsel for *Amicus Curiae*</u>:
Gene C. Schaerr
Donald M. Falk
SCHAERR | JAFFE LLP


<u>*/s/ Donald M. Falk*</u>
Donald M. Falk

*Counsel of Record for* Amicus Curiae
*Prof. John Yun*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS............i

TABLE OF AUTHORITIES .................................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY TO FILE BRIEF ...................................... 1

RULE 29(a)(4)(e) STATEMENT ............................................................ 2

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ......................................................................................... 7

    I.    Antitrust Harm From A Group Boycott Need Not Involve The Plaintiff's Competitors. ...................................................... 7

    II.    An Anticompetitive Agreement Can Be Manifested Through Delegated Authority. ................................................. 14

    III.    X Corp. Pleaded Anticompetitive Injury Because It Was Harmed By The Alleged Horizontal Collusion. ......................... 23

CONCLUSION ...................................................................................... 34

CERTIFICATE OF SERVICE ............................................................... 35

CERTIFICATE OF COMPLIANCE ...................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Alvord-Polk v. F. Schumacher & Co.,*
  37 F.3d 996 (3d Cir. 1994)...................................................14, 18, 22

*American Soc'y of Mech. Engineers v. Hydrolevel Corp.,*
  456 U.S. 556 (1982) ........................................................16, 17, 22

*Anago, Inc. v. Tecnol Med. Prods., Inc.,*
  976 F.2d 248 (5th Cir. 1992) ....................................................33

*Atlantic Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ...............................................................32

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ..........................................................15, 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .................................................................3

*California Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ..........................................................25, 26

*Copperweld Corp. v. Independence Tube Corp.,*
  467 U.S. 752 (1984) ..........................................................23, 24

*Doctors Hosp. of Jefferson, Inc. v. Southeast Med.*
  *Alliance, Inc.,* 123 F.3d 301 (5th Cir. 1997) .............................5, 32, 34

*Eastern States Retail Lumber Dealers' Ass'n v.*
  *United States,* 234 U.S. 600 (1914)..................................15, 16, 26, 30

*FTC v. Indiana Fed'n of Dentists,*
  476 U.S. 447 (1986) .........................................................*passim*

*FTC v. Superior Court Trial Lawyers Ass'n,*
  493 U.S. 411 (1990) .........................................................*passim*

*Grenada Lumber Co. v. Mississippi,*
  217 U.S. 433 (1910) ...............................................................26

*Mandeville Island Farms v. Am. Crystal Sugar Co.,*
  334 U.S. 219 (1948) ...............................................................32

*Monsanto Co. v. Spray-Rite Service Corp.,*
  465 U.S. 762 (1984) ............................................................15

*Nat'l Society of Pro. Engineers v. United States,*
  435 U.S. 679 (1978) ...........................................................7, 8

*Rx Sols., Inc. v. Caremark, L.L.C.,*
  164 F.4th 436 (5th Cir. 2026).................................................3

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
  253 F.3d 215 (5th Cir. 2001) ...............................................12

*Tesla, Inc. v. La. Auto. Dealers Ass'n,*
  113 F.4th 511 (5th Cir. 2024)................................................32

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.,*
  496 F.3d 403 (5th Cir. 2007) ...........................................12, 31

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ................................................23

**Rule**

Fed. R. App. P. 29 ....................................................................2

**Other Authorities**

Brad Adgate,
  *With Concerns About Brand Safety, More Advertisers
  Have Left X*, FORBES (Dec. 7, 2023)....................................21

C. Paul Rogers III,
  *Consumer Welfare and Group Boycott Law,*
  62 SMU L. REV. 665 (2009) ..............................................9, 12

Kenneth L. Glazer,
  *Concerted Refusals to Deal Under Section 1 of the
  Sherman Act*, 70 ANTITRUST L.J. 1 (2002) ...........5, 6, 12, 13

Press Release,
  *Twitter Announces Its Acceleration Agenda with GARM to
  Answer Brand Safety Needs*, WORLD FED'N OF ADVERTISERS
  (Dec. 19, 2022) ..............................................................27, 28

## IDENTITY AND INTEREST OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY TO FILE BRIEF

Amicus curiae John Yun is Professor of Law at the Antonin Scalia Law School, George Mason University. Previously, Prof. Yun was a staff economist and an acting deputy assistant director in the Bureau of Economics at the Federal Trade Commission. He teaches Economics for Lawyers, an IP and Antitrust Seminar, and a Law & Economics Colloquium, and among his areas of research are antitrust, IP, privacy, and digital markets.

Prof. Yun submits this brief because the present case raises important questions concerning the application of § 1 of the Sherman Act to coordinated conduct undertaken through trade associations and industry coalitions. He has no personal stake in the outcome of this case, but he has a substantial professional interest in ensuring that antitrust doctrine continues to provide meaningful scrutiny of collective conduct where such coordination may distort competition and improperly tilt bargaining power in favor of the collective. The district court's decision risks narrowing the circumstances under which plaintiffs may challenge coordinated conduct occurring through trade associations and their authorized agents in leadership.

*Amicus* is authorized to file this brief by Fed. R. App. P. 29(a)(2) because all parties have consented to its filing.

## RULE 29(a)(4)(e) STATEMENT

*Amicus* hereby states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and that no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court dismissed the case because it concluded that X Corp. had not stated an antitrust injury, that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also*, *e.g.*, *Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 444 (5th Cir. 2026). The district court opinion rests on the remarkable proposition that the direct victim of horizontal collusion has not suffered antitrust injury unless the colluding parties either are its competitors or seek to allow a competitor to dominate the victim's market.

That cannot be right—and it isn't. There is no basis in antitrust law for the narrow notion that horizontal collusion cannot cause antitrust injury unless the collusion either includes the victim's competitor or allows a competitor of the victim to "corner" a market. ROA.2446.

The district court held that "illegal group boycotts must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement." ROA.2444. In the court's view, "even a boycott claim falling under the *per se* approach must involve 'joint efforts

by a firm or firms to disadvantage competitors' either directly or by pressuring others." *Id.* Thus, "[i]f the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury." *Id.* Because the defendants here were customers rather than competitors of plaintiff X, the court concluded that "X has not stated an antitrust injury." *Id.* Under that view, the claims could be sustained only if either the World Federation of Advertisers' Global Alliance for Responsible Media (GARM) "operated at an X competitor's behest to put X out of business," or "GARM advertisers sought to exclude competing advertisers from doing business." ROA.2450.

In short, the district court held that X had not pleaded an antitrust violation on the merits and, therefore, had not pleaded antitrust injury. The premise and conclusion are both incorrect. The district court's restrictive view of the boycott violation—and standing to recover for it— is incorrect as a matter of law and economics. The district court effectively required X to "establish a market-wide injury to competition"—which can be necessary to prove "substantive liability"— "as an element of standing." *Doctors Hosp. of Jefferson, Inc. v. Southeast*

4

*Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). But this Court has rejected that approach. *Id.*

And the district court was wrong to hold categorically that a horizontal agreement among competitors to withhold purchases does not violate the antitrust laws. The decision below improperly excuses concerted conduct among horizontal competitors so long as they do not directly or indirectly involve a plaintiff's competitor; otherwise, the district court maintains, the plaintiff's harm from the horizontal collusion does not amount to antitrust injury. In contrast, the Supreme Court and other courts have recognized that harm to competition can occur—not only by advantaging competitors to the plaintiff—but through the joint actions of the members of a trade association that leverages their collective market power to disadvantage the members' trading partner in commercial negotiations. "[T]he 'group boycott' label" comprises both "agreements designed to lessen competition among the conspirators ('collusive' agreements) and those that are intended to exclude a rival ('exclusionary' agreements)." Kenneth L. Glazer, *Concerted Refusals to Deal Under Section 1 of the Sherman Act*, 70 ANTITRUST L.J. 1, 1-2 (2002). "'[C]ollusive' agreements are … aimed

directly at improving the terms (price or non-price) on which suppliers deal with their customers (or customers deal with their suppliers, as the case may be)." *Id.* at 4.

In these cases, the horizontal collusion directly harms the trading partner (plaintiff); that harm need not involve the plaintiff's competitors to constitute antitrust injury (although it may). That is, a boycott may violate the antitrust laws because it is collusive even if it does not directly exclude the boycotters' competitors.

This brief details how group boycotts may cause antitrust injury without being directed at allowing "another upstream supplier [i.e., a plaintiff's competitor] to corner the supply market." ROA.2445. The brief then explains that an agreement to engage in collusive business practices can manifest through a delegated authority given to executives or other leadership entities of a trade association. Finally, the brief explains why X Corp. plausibly asserted anticompetitive injury from the defendants' activities.

## ARGUMENT

### I. Antitrust Harm From A Group Boycott Need Not Involve The Plaintiff's Competitors.

The district court's central error was its categorical conclusion that a group boycott claim that "does not directly or indirectly involve the plaintiff's competitor" necessarily "does not state an antitrust injury." ROA.2444. Precedent places no such limit on boycott claims or the ability to recover for them. Although the district court couched its conclusion in terms of antitrust injury, much of its discussion addressed whether X Corp. had pleaded an antitrust violation rather than whether X Corp. was injured by the unlawfully anticompetitive collusion among advertisers and their intermediaries. But the district court misunderstood the nature of the boycott violation as the Supreme Court and this Court have explained it.

An instructive example is *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978). That case involved a trade association of engineers who collectively refused to engage in competitive price bidding under the rationale that this would create a race to the bottom and compromise public safety with suboptimal structural designs. *See id.* at 681. The Court held that, while the

7

association's rule was not strictly price-fixing, the policy "impede[d] the ordinary give and take of the market place." *Id.* at 692 (quoting district court). The Court explicitly rejected the idea that collusion to promote "safety" can trump competition, as this would be "nothing less than a frontal assault on the basic policy of the Sherman Act." *Id.* at 695. There was no claim that the competitors to the target clients benefited or that competitors to the colluding engineers were harmed. Yet the Court found that collective restriction of bargaining terms to obtain better commercial terms of trade—there, a requirement that an engineer be selected before negotiating price—can be an antitrust violation. *See id.* at 682 (describing restriction); *id.* at 694–96 (finding violation). As the Court observed, the premise of the antitrust laws is that "all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *Id.* at 695.

Similarly, in *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), a group of attorneys that represented indigent criminal defendants collectively refused to accept new cases until the government agreed to increase their fees. The Supreme Court held that the boycott

was a *per se* violation because it was a concerted refusal to deal intended to raise prices in the downstream market for legal services in which the attorneys competed. *Id.* at 422–23. Again, the target was a single "important customer in the market for legal services." *Id.* at 423. The case did not involve any actual or intended benefit to competitors to the target of the conspiracy (the DC government), nor were the lawyers trying to exclude their own competitors. As in *Professional Engineers*, the nature of the restraint in *Trial Lawyers* was members' use of collective market power to bargain for better terms of trade with their trading partner, harming that partner (in the form of increased fees) as a result of that collective conduct. *See id.* at 417.[1] This impaired the competitive process where each lawyer could decide "independently whether and how often to offer to provide services to the District at [the offered] rates." *Id.* at 422. The Court rejected the lawyers' justification that "quality of

_____

[1] As one commentator noted, "the collective action in *Superior Court Trial Lawyers Ass'n* constituted a vertical rather than exclusionary boycott since the lawyers were simply seeking better rates and not attempting to exclude competitors." C. Paul Rogers III, *Consumer Welfare and Group Boycott Law*, 62 SMU L. REV. 665, 672 (2009). Nonetheless, "the only customer or consumer in this case, the District of Columbia, which purchased the defendants' services, was indeed harmed since higher fees would result." *Id.*

representation" may have improved. *Id.* at 423. Although *Trial Lawyers* involved an enforcement-agency plaintiff, the decision's logic precludes a contention that the boycott target—the DC government—lacked antitrust injury sufficient to sue on its own behalf.

Another example is *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), which upheld the FTC's challenge to a trade association rule that prohibited member dentists from submitting x-rays to insurers in conjunction with insurance benefits determinations. *See id.* at 464. Applying the rule of reason, the Court rejected the association's "quality of care" justification and emphasized that market forces, rather than collective restrictions, should govern commercial relationships. *Id.* at 462-63. *Indiana Dentists* reflects the principle that a cooperative leveraging of market power—even without direct proof of harm—can violate § 1 of the Sherman Act under the rule of reason. *Id.* at 462-64. Thus, the Court did not demand a counterfactual market analysis where "the policy resulted in the provision of dental services that were more costly than those that the patients and their insurance would have chosen were they able to evaluate x rays in conjunction with claims forms." *Id.* at 461. Indeed, "even if the desired information were in fact

completely useless to the insurers and their patients in making an informed choice regarding the least costly adequate course of treatment … the Federation would still not be justified in deciding on behalf of its members' customers that they did not need the information." *Id.* at 461, 462. The collective deprivation of a potential market input—here, x-rays—was itself sufficient competitive harm.

The Court in *Indiana Dentists* also addressed whether group boycott claims are available only if competitors to the target of the boycott are involved. Noting that "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor," the Court recognized that "situation [was] obviously not present" in the dentists' restraint. *Id.* at 458.

Two points are worth emphasizing. First, for *per se* cases, the Court affirmed that group boycott claims are "generally" limited to scenarios where the intent is "to discourage … doing business with a competitor." Notably, however, the Court referenced a competitor *to the trade association*—not a competitor to the target of the boycott. Second, the

11

Court was discussing *per se* claims only and upheld the rule of reason claim at issue. There is no basis to extend even that "general[]" observation to boycott claims that are assessed under the rule of reason. Indeed, this Court has noted that *per se* condemnation may in fact apply even though participants in an alleged group boycott do not include a competitor of the victim. *See Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414 (5th Cir. 2007). It is the horizontal nature of the restraint that reflects inherent harm to competition; the "horizontal agreement need not be between competitors of the victim." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001).

In sum, not all antitrust claims involving trade associations and group boycotts require the involvement of the target's or trade association's competitors.[2] The antitrust injury can manifest through

---

[2] Other commentators have recognized this breadth of potential liability for collective action among competitors. *See, e.g.*, Rogers, *supra*, at 671 ("Collective action that does not involve the attempted exclusion of a competitor but rather seeks a collective benefit from refusing to deal is often labeled a vertical boycott by lower courts, which have tended to apply the rule of reason."); Glazer, *supra*, at 9 (agreement in *Indiana Dentists* "had nothing to do with exclusion of any actual or potential competitor of the conspiring dentists from the market").

coercion and manipulation of the terms of trade from the collective action of the trade association members.[3] In the present case, X does allege that "the boycott of Twitter predictably caused GARM-member advertisers and advertising agencies to shift their advertising purchases to other social media platforms rather than to other sellers of advertising." ROA.534. The collusive shifting of purchases away from X and to competing social media platforms is a direct result of the alleged anticompetitive collusion.

In addressing these issues, the district court properly explained that "X alleges a conspiracy driven by advertisers not to further X-competitor social media companies' interests but to pursue their own collective interests as to where they place their advertisements." ROA.2446. Similarly, the court details that "GARM was organized by advertisers and reflected their 'avowed commitment to furthering [their]

---

[3] *See, e.g.*, Glazer, *supra*, at 12 (detailing how victims to a collusive agreement can be customers or suppliers to the conspirators where the agreement "is designed to force the upstream or downstream firms to accept certain conditions for dealing, whether price or non-price. The boycotters in such cases are in essence saying, 'we will not deal with you except on these conditions[]' … [and is not] designed to put anyone out of business. … The boycott simply represents a by-product of the underlying collusive agreement.").

economic interests … as a group.'" ROA.2446. Whether their actions are procompetitive or anticompetitive, all trade associations share a purpose of advancing the collective interests of association members rather than outsiders. Thus, the relevant questions are whether (a) there was an agreement among the members and (b) whether their collective action resulted in an unreasonable restraint of trade that caused anticompetitive harm. The district court was wrong to impose additional and artificial limits on antitrust liability.

## II. An Anticompetitive Agreement Can Be Manifested Through Delegated Authority.

Perhaps the most critical issue in trade association and group boycott cases is whether the challenged conduct reflects an "agreement" that suppressed competition among horizontal competitors. As the Third Circuit noted in *Alvord-Polk v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994), this determination may not be straightforward: "[j]udicial scrutiny of alleged concerted action, undertaken to determine whether it was the result of an agreement, is an intricate endeavor." *Id.* at 1008. Agreements may be established through direct evidence, but often courts must infer coordination from circumstantial evidence and the surrounding economic context, that is, "direct or circumstantial evidence that reasonably tends

14

to prove that the [participants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 762, 768 (1984)).

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), sets the standard for pleading direct or circumstantial evidence of anticompetitive collusion. In that case, the Supreme Court held that, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Thus, while an agreement can be inferred based on the circumstances, a mere allegation of parallel behavior is not enough.

Yet courts have repeatedly recognized that agreements will rarely be explicit. In *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914), the Supreme Court explained:

> True it is that there is no agreement among the retailers to refrain from dealing with listed wholesalers, nor is there any penalty annexed for the failure so to do; but he is blind indeed who does not see the purpose in the predetermined and periodical circulation of this report to put the ban upon wholesale dealers whose names appear in the list … .

*Id.* at 608-09. The Court found it beyond dispute that the report's circulation "had and was intended to have the natural effect of causing such retailers to withhold their patronage from the concern listed." *Id.* at 609. Thus, while parallel conduct is not enough to infer an agreement, actions such as sharing information among trade group members, where the intent and effect are plain to see, can be sufficient.

The agreement inquiry becomes especially salient where trade associations act through designated agents or leadership structures. In *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982), the Supreme Court addressed whether a trade association could be held liable for anticompetitive conduct undertaken by an authorized agent of the group. *Hydrolevel* involved a trade association of mechanical engineers (ASME) that performed various functions including promulgating and publishing industry codes and standards. *See id.* at 559. The key issue was whether a subcommittee chair's "unofficial communication" carried the weight of the organization in branding as unsafe a technology that competed with a prominent association member. *See id.* at 561-62.

The Court held that it did, explaining that "ASME's system of codes and interpretative advice would not be effective if the statements of its agents did not carry with them the assurance that persons in the affected industries could reasonably rely upon their apparent trustworthiness." *Id.* at 567. Importantly, "[w]hen it cloaks its subcommittee officials with the authority of its reputation, ASME permits those agents to affect the destinies of businesses, and thus gives them the power to frustrate competition in the marketplace." *Id.* at 570-71.

What about the defense that the members of ASME did not explicitly agree to boycott or exclude a competing technology by formally ratifying the agent's conduct? Liability could not be restricted to situations where the organization formally ratified an agent's action, because "a ratification rule would have anticompetitive effects." *Id.* at 573. A trade group could effectively immunize itself "by ensuring that it remained ignorant of its agents' conduct," which "would actually enhance the likelihood that the Society's reputation would be used for anticompetitive ends." *Id.*

Thus, while *Hydrolevel* did not involve an explicit member agreement to boycott a competing technology, mutual participation in an

organization structured to delegate authority to specific agents had the same effect. The actions of those agents were sufficient to find antitrust liability.

*Alvord-Polk* represents another example where a court found delegated authority sufficient to support an inference of agreement to engage in concerted action. *See* 37 F.3d at 1002-04. That case involved an attempt by the National Decorating Products Association (NDPA) to prevent discount, 800-number wallpaper dealers from free-riding off NDPA members' efforts. *Id*. at 1002. Specifically, an NDPA executive threatened a boycott of manufacturers who did business with the discount dealers. The Third Circuit held that the executive's threat could be attributed to the NDPA and viewed as "concerted action": "a rational jury could find that NDPA did more than serve as a conduit for members' complaints," but rather, "acting through its officers, threatened a retailers' boycott of manufacturers." *Id*. at 1010. That is, a jury could find that the NDPA executive "went beyond merely voicing complaints to manufacturers to actually coercing (or attempting to coerce) them into cooperating in eliminating 800-number dealers." *Id*. The alleged conduct sought to reshape distribution channels by pressuring upstream

18

manufacturers with the power of the trade association members' coordinated conduct, albeit with the intent of harming horizontal competitors.

The X complaint contends that GARM expected members to boycott "non-compliant" platforms such as Twitter. ROA.487-88. The complaint also pleads that the "collective action among competing advertisers to dictate brand safety standards to be applied by social media platforms" distorted the competitive process and permitted "the collective views of a group of advertisers with market power to override the interests of consumers." ROA.488. And the complaint alleges that GARM's "avowed purpose" was "to leverage the collective market power of its advertiser members to advance their economic interests by forcing changes to the business operations of digital media and social media platforms that sell advertising inventory to GARM members or to their clients." ROA.498. The key question is whether the members, or a subset of members, agreed to a coercive collective action, or, as the Supreme Court found in *Twombly*, at most engaged in conscious parallelism.

The complaint details that various members of the Steer Team withdrew advertising from Twitter in November 2022, either directly or

by recommending (successfully) that their clients do so. ROA.519-20; ROA.531. "[A]t least eighteen GARM-member advertisers stopped purchasing advertising from Twitter," and "dozens more substantially reduced their purchases." ROA.531. Following these actions, the complaint further alleges that GARM's Initiative Lead and Steer Team exploited their collective leverage and jointly negotiated with Twitter while disseminating updates to the broader GARM membership on the status of the negotiations. ROA.525-27.

In the district court, GARM responded that the complaint alleges that only eighteen of its 118 members boycotted the X platform. *See* Dist. Ct. ECF No. 161, at 2. Yet the significance of an alleged boycott does not turn solely on the number of participants. Neither the complaint nor the defendants' response provides information about the relative economic importance of the boycotting advertisers (or those advertisers that reduced, but did not stop, their spending). Even so, the withdrawal of major global advertisers and leading media-buying agencies— particularly those entities that were part of the Steer Team that negotiated on behalf of GARM—could plausibly have had material commercial consequences. ROA.519-20. Contemporaneous media

accounts reported that "50 of Twitter's top 100 advertisers," accounting for $750 million in revenue in 2022, "had either cut back or stopped advertising entirely on the website." *See also* Brad Adgate, *With Concerns About Brand Safety, More Advertisers Have Left X*, FORBES (Dec. 7, 2023) (citing Media Matters report naming "VW, General Motors, Diageo, Heineken, Nestle, Coca-Cola, Mars and Ford" among the participating advertisers).

More fundamentally, anticompetitive coordination does not rest on an association-wide refusal to deal. Rather, in this case, the primary and critical coordination operated through the joint bargaining executed by the Initiative Lead and Steer Team on behalf of GARM's members. The leadership group appeared to operate with a delegated authority to negotiate on behalf of the organization and communicate expectations to its members. Thus, even if individual members did not explicitly agree to an action, the association nonetheless may have engaged in concerted action through its leadership structure. That conduct produced coordinated economic effects when advertisers agreed (directly, or through their agencies) to actually stop or curtail advertising.

This theory of an agreement is consistent with *Hydrolevel*, where the Supreme Court held that trade group "agents exercise economic power because they act with the force of the…[group's] reputation behind them." 456 U.S. at 574. And it resembles *Alvord-Polk*, where the Third Circuit found sufficient evidence that the trade group threatened a boycott through its officers, and thus could be liable under Section 1. *See* 37 F.3d at 1010.

Viewed through this lens, the defendants' reliance on *Twombly* is misplaced. See Dist. Ct. ECF No. 161, at 10, 12. *Twombly* addresses the problem of inferring an agreement from mere parallel conduct among competitors acting in the marketplace. The allegations against GARM, by contrast, appear to go beyond mere "inferential possibilities" or a simple "allegation of parallel conduct and a bare assertion of conspiracy." *Twombly*, 550 U.S. at 556. Rather, X's claim involves allegations of structured coordination through a centralized leadership group that was expressly authorized to negotiate on behalf of the members and that communicated recommendations and expectations about member behavior. Most important, the complaint pleads that members' actions fulfilled the expectations through concerted behavior.

## III. X Corp. Pleaded Anticompetitive Injury Because It Was Harmed By The Alleged Horizontal Collusion.

To establish antitrust liability, the conduct at issue "must harm the competitive process and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). The question then becomes: what type of evidence must plaintiffs produce to demonstrate harm to the competitive process? It depends on the nature of the restraint. For instance, the Supreme Court has established that there may be different burdens when considering independent versus coordinated actions because "Congress treated concerted behavior more strictly than unilateral behavior." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). As the Court explained:

> Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.

*Id.* at 768-69. When "two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit," their concerted action "not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." *Id.* at 769. The

"anticompetitive potential" inherent in concerted action "is sufficient to warrant scrutiny even in the absence of incipient monopoly." *Id.*

Accordingly, while some unilateral conduct cases may involve a detailed examination into the counterfactual world without the conduct at issue, coordinated actions—absent a sound procompetitive justification—inherently combine market power and eliminate independent actions. This loss of competition reflects the very nature of coordination among competitors. *See id.*

Consistent with this approach, the Court in *Indiana Dentists* explained that, "even if the restriction" on sharing x-rays was "not sufficiently 'naked'" to warrant *per se* condemnation, "the Commission's failure to engage in detailed market analysis is not fatal to its finding of a violation of the Rule of Reason." 476 U.S. at 460. The point is that there could be other indicators of a restraint harming competition—including the actual inability of insurers "to obtain compliance requests for submission of x rays." *Id.* These indicators—which suggest that the coordinated action is likely to harm competition—permitted a "quick look" rule-of-reason analysis that required minimal evidence that the restraint had adverse consequences on the market.

By contrast, in *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), the Court ruled that the trade group's restrictions on members advertising their services should be examined under "a more thorough" version of the rule of reason rather than a "quick look." *Id.* at 759. The Court emphasized that under a "quick look" analysis, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 770. Yet the California dentists' advertising restrictions did not "present a situation in which the likelihood of anticompetitive effects is comparably obvious." *Id.* at 771. Rather, the "advertising restrictions might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *Id.* Here, the Court gave some deference to professionals and potential restrictions necessary to promote efficient markets, in particular the challenges consumers face in evaluating incomplete quality claims for professional services. *Id.* at 772.[4] Ultimately, the Court affirmed that the

---

[4] *See also id.* ("In a market for professional services, in which advertising is relatively rare and the comparability of service packages not easily established, the difficulty for customers or potential competitors to get and verify information about the price and availability of services

quality of proof to demonstrate anticompetitive harm should vary based on the nature of the restraint and the circumstances of the case. *Id.* at 778-80.

In the present case, the defendants have argued that injury merely to oneself, rather than to the competitive process, does not qualify as antitrust injury. Dist. Ct. ECF No. 161, at 32. This framing conflates the analysis applicable to unilateral conduct with that governing coordinated actions. The very nature of a group boycott or cooperative bargaining reduces competition among the participants in order to target a specific competitor or trading partner. As the Court explained a century ago, an "act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed." *Eastern States Lumber*, 234 U.S. at 614 (quoting *Grenada Lumber Co. v. Mississippi*, 217 U.S. 433, 440-41 (1910)).

---

magnifies the dangers to competition associated with misleading advertising.").

Even setting aside whether X Corp. was the target of a group boycott that was illegal *per se*, the question presented on appeal is whether it suffered anticompetitive injury when GARM's Initiative Lead and Steer Team collectively sought to alter the terms on which Twitter could negotiate with members of GARM, and GARM members complied with calls to boycott Twitter, allegedly to increase GARM's (and thus their own) leverage. Perhaps the most telling list of demands is a WFA-GARM press release from December 2022, reporting the results of their negotiations with Twitter.[5] The release noted that "the leadership team from Twitter met with the WFA Executive Committee and the GARM Steer Team," seeking these enumerated "outcomes":

- "Development of an advertising safety error rate."

- "Development of a third-party endorsed social listening program."

- "[I]ncreased data access of existing third-party social listening partners."

---

[5] Press Release, *Twitter Announces Its Acceleration Agenda with GARM to Answer Brand Safety Needs*, WORLD FED'N OF ADVERTISERS (Dec. 19, 2022), available at Internet Archive, Wayback Machine, https://web.archive.org/web/20230206055821/https://wfanet.org/knowledge/item/2022/12/19/Twitter-announces-its-acceleration-agenda-with-GARM-to-answer-brand-safety-needs (archived, Feb. 2, 2023).

- "Increase the recency and granularity of Twitter's transparency reporting for the purposes of understanding platform safety and advertising suitability."

- "Increase advertiser safety and suitability controls for campaigns and post-campaign transparency."

- "Fast-track planned testing and deployment of third-party post-campaign verification tools."

- "Fast-track the development of first-party targeting and adjacency tools using the GARM Brand Safety Floor + Suitability Framework and the GARM Adjacency Standards Framework."

- "Certify brand safety operations and effectiveness via industry-aligned independent auditing bodies."

Press Release, *supra* n.5. The release further announced that these commitments were shared with the broader GARM membership and that "[t]here are other outstanding issues that the GARM Steer Team is working on with Twitter to resolve, largely around business continuity and compliance, which will be managed in parallel." *Id.*

Taken as a whole, the press release reveals a considerable amount of information. First, the WFA and GARM leadership group—including members of the Steer Team—announced that they jointly negotiated commercial terms of trade with Twitter. Second, the GARM leadership group shared the details of these negotiations with "the GARM Community." Third, the outcomes from the joint bargaining plausibly

amounted to a reduction in the quality-adjusted price for GARM members to advertise on the platform.[6] On this point, the X Corp. complaint alleges that "GARM-member advertisers and advertising agencies force social media platforms to incur certain costs previously borne by advertisers," ROA.504-05, and that the benefits to the collective "exceed what GARM members were able to achieve through unilateral and independent negotiations with those platforms." ROA.505.

Thus, while GARM characterizes its role as seeking "to create 'common definition[s], common measures, and common tools' to facilitate negotiations between advertisers and platforms," Dist. Ct. ECF No. 161, at 4, its demands—while relating to brand safety—offered tangible, commercial benefits to its members. Specifically, the GARM leadership team's demands included (1) development of "an advertising safety error rate," (2) more granular data, (3) fast-tracking post-campaign verification and first-party targeting tools, and (4) achieving certification through an

---

[6] A quality-adjusted price normalizes "quality" to make an apples-to-apples comparison. For instance, if a manufacturer used to charge $5 for five health bars but then charges $5 for four health bars, then the new, quality-adjusted price is $6.25 for a 5-bar equivalent (an increase of 25%). Similarly, if an advertiser secures more ad campaign tools and benefits for each ad dollar, then the quality-adjusted price has fallen.

audit. While all these demands could be reasonably related to safety, collectively demanding quality improvements from a trading partner does not immunize the collective action. As the Supreme Court put it, "[t]he social justifications proffered for [a] restraint of trade … do not make it any less unlawful." *Trial Lawyers*, 493 U.S. at 424.

GARM's leadership group thus operated as a mechanism for coordinated commercial pressure on ad-supported platforms such as Twitter, based on demands made in cooperation with its member advertisers and bolstered by those advertisers' concerted economic coercion. Similarly, the sharing of details of these commercial negotiations with GARM members recalls *Eastern States Lumber*. In that case, the trade association's practice of circulating blacklist reports "directly" resulted in association members withholding business even if they had "no personal grievance against" the blacklisted dealers. 234 U.S. at 612. Rather, the collective restraint arose "solely because of the influence of the report circulated among the members of the associations." *Id*. Nor is that assessment a relic of a bygone era. This Court adopted similar reasoning in *Tunica*, concluding that individual refusals in the wake of a trade group's instructions not to deal with the

30

plaintiff raised triable issues of fact as to the existence of an unlawful horizontal conspiracy. 496 F.3d at 403, 410.

X's complaint plainly alleges that GARM's instructions to its members had the effect predictable under *Eastern States Lumber*. Not only did a GARM official threaten Twitter with an advertiser boycott, ROA.521; ROA.527-28, but GARM members implemented the boycott, ROA.531-34, and the same GARM official took credit for the boycott's economic effects, ROA.529.

Finally, GARM contended that there was no antitrust injury because "X does not allege there are fewer social media platforms in the purported market, fewer ads being run than would be expected, or lower ad prices than there should be in a competitive market." Dist. Ct. ECF No. 161, at 21. Given X's concessions detailed in GARM's press release, however, GARM members did enjoy a lower quality-adjusted ad price. Further, this argument misconceives the nature of the alleged harm, which results from being the target of a concerted action. Inquiries into whether output or prices are actually lower or higher, respectively, could potentially be part of a detailed rule of reason analysis, but this is not necessarily a requirement to establish liability. Nor, even assuming

output did not change, would this be a requirement if the leveraged bargaining resulted in a transfer of economic rents from the target to the group.

As noted above, the victim of collusive conduct among horizontal competitors need not "establish a market-wide injury to competition as an element of standing." *Doctors Hospital*, 123 F.3d at 305. Rather, the antitrust injury inquiry focuses on whether the plaintiff's asserted injury "is attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). As this Court has put it, the injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Tesla, Inc. v. La. Auto. Dealers Ass'n*, 113 F.4th 511, 528 (5th Cir. 2024).

The antitrust laws were designed to protect market participants from harms resulting from collusive conduct whether by buyers or sellers. *See Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). And it is the horizontal combination reflected in advertisers' joint refusal to purchase from Twitter that is the "anti-competitive aspect" of the alleged violation. *Atlantic Richfield*, 495 U.S.

at 334. As the Supreme Court recognized in *Trial Lawyers*, "a concerted refusal" to do business with an "important" participant in the market may be unlawful—even *per se*—because "[e]very such horizontal arrangement among competitors poses some threat to the free market." 493 U.S. at 434. X alleged injury from precisely the collusive conduct that rendered GARM members' coordinated action unlawful. Thus, the alleged "injuries are related to the anticompetitive effects" of that conduct. *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 251 (5th Cir. 1992).

As the Supreme Court held in *Indiana Dentists*, the mere fact that insurers could not access x-rays due to the concerted behavior was sufficient to show both that the concerted behavior happened and that the conduct impaired the competitive process. 476 U.S. at 456-57. And here, large swaths of GARM's membership actually complied with the Steer Team's instruction to eliminate or reduce purchases from Twitter in order to enhance the members' collective bargaining power.

The district court's antitrust injury analysis is ultimately too narrow. This Court has made clear that "injury to competition in the market" is not "a prerequisite of … antitrust injury." *Doctors Hospital*,

123 F.3d at 306. And that certainly is true when horizontal conduct is at issue. Otherwise, victims of many horizontal restrictions on price, inputs, or output might lack standing to sue even for *per se* violations. But that is not the law, and the district court's order based on that mistaken premise should be reversed.

## CONCLUSION

The judgment should be reversed.

<table>
<tr><td>August 12, 2026</td><td>Respectfully submitted,</td></tr>
</table>

*/s/ Donald M. Falk*
Donald M. Falk
SCHAERR | JAFFE LLP
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for* Amicus Curiae

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on August 12, 2026, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system; service on counsel for all parties was accomplished by electronic mail or by service through the Court's electronic filing system.

*/s/ Donald M. Falk*
Donald M. Falk

# CERTIFICATE OF COMPLIANCE

The foregoing brief contains 6,394 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 2016 in 14-point Century Schoolbook font.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

August 12, 2026                    */s/ Donald M. Falk*
                                   Donald M. Falk