**No. 26-10394**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

X Corp.,

*Plaintiff-Appellant,*

v.

Mars, Incorporated; CVS Health Corporation; Nestle SA; Nestle USA, Incorporated; Abbott Laboratories; Colgate-Palmolive Company; Lego A/S; Lego Brand Retail, Incorporated; Pinterest, Incorporated; Tyson Foods, Incorporated; Shell USA, Incorporated; Shell Brands International, AG; Orsted Services A/S,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS
(JUDGE JANE J. BOYLE)

## BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT

STANLEY E. WOODWARD, JR.
  *Associate Attorney General*

EMILY CLAIRE MIMNAUGH
  *Deputy Associate Attorney General*

MICHAEL WEISBUCH
  *Senior Counsel to the Associate Attorney General*

G. CHARLES BELLER
  *Deputy Assistant Attorney General*

ETHAN S. HOFFMAN
  *Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
  *Attorneys*
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW
Washington, DC 20530-0001
Tel. 202-353-0256

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

STATEMENT OF INTEREST.............................................................................1

STATEMENT OF ISSUES PRESENTED .........................................................2

STATEMENT ........................................................................................................2

SUMMARY OF ARGUMENT.............................................................................7

ARGUMENT .........................................................................................................9

    I.    The District Court Improperly Conflated Antitrust Injury With the Merits. . 11

    II.    The District Court Erred In Its Merits Analysis of Group Boycotts. .................. 16

        A.    The Alleged Group Boycott Can Be Unlawful Even If One of X's Competitors Did Not Direct It. ................................................................ 16

        B.    There Are More Viable Boycott Theories Than the District Court Considered. ................................................................................................ 20

CONCLUSION..................................................................................................... 24

CERTIFICATE OF COMPLIANCE................................................................ 26

CERTIFICATE OF SERVICE .......................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ...................................................................................... 23

*Associated General Contractors of California, Inc. v. California State Council of
Carpenters,* 459 U.S. 519 (1983) .................................................................... 9

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .................................................................................. 9, 10

*Baker v. Putnal*,
75 F.3d 190 (5th Cir. 1996) ............................................................................ 3

*Board of Trade of the City of Chicago v. United States*,
246 U.S. 231 (1918) ...................................................................................... 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................ 9, 11, 13

*DirecTV, LLC v. Nexstar Media Group, Inc.*,
162 F.4th 295 (2d Cir. 2025) .......................................................................... 1

*Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*,
123 F.3d 301 (5th Cir. 1997) .................................................................... 12, 13

*E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*,
467 F.2d 178 (5th Cir. 1972) ........................................................................ 17

*Ellis v. Salt River Project Agricultural Improvement & Power District,*
24 F.4th 1262 (9th Cir. 2022) .................................................................2, 10

*Fashion Originators' Guild of America, Inc. v. FTC,*
312 U.S. 457 (1941) .................................................................... 17

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1986) ........................................................ 16

*FTC v. Indiana Federation of Dentists,*
476 U.S. 447 (1986) ..............................................................14, 18

*FTC v. Superior Court Trial Lawyers Association,*
493 U.S. 411 (1990) ................................................................... 17

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,*
340 U.S. 211 (1951) ................................................................... 17

*Klor's, Inc. v. Broadway-Hale Stores, Inc.,*
359 U.S. 207 (1959) ..............................................................21, 22

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
232 F.3d 979 (9th Cir. 2000) ...................................................... 15

*Lawlor v. National Screen Service Corp.,*
349 U.S. 322 (1955) ..................................................................... 1

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,*
334 U.S. 219 (1948) ..............................................................15, 21

Page(s)

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) .................................................... 18, 19, 22

*Northern Pacific Railway Co. v. United States*,
  356 U.S. 1 (1958) ..................................................................... 9, 14

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) ................................................................. 13

*NCAA v. Alston*,
  594 U.S. 69 (2021) ................................................................... 21

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery &*
  *Printing Co.*, 472 U.S. 284 (1985) ....................................... 18, 19, 20, 22, 23

*Ohio v. American Express Co.*,
  585 U.S. 529 (2018) ................................................................. 20

*PLS.com, LLC v. National Association of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ................................................ 2, 14, 15, 20, 22

*Pulse Network, L.L.C. v. Visa, Inc.*,
  30 F.4th 480 (5th Cir. 2022) .................................................. 10, 11

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
  364 U.S. 656 (1961) ................................................................. 23

*RX Solutions, Inc. v. Caremark, L.L.C.*,
  164 F.4th 436 (5th Cir. 2026) ................................................ 14

Page(s)

*Sanger Insurance Agency v. HUB International, Ltd.*,
802 F.3d 732 (5th Cir. 2015) ........................................................ 12

*Silver v. New York Stock Exchange*,
373 U.S. 341 (1963) ........................................................................ 22

*Spectators' Communication Network, Inc. v. Colonial Country Club*,
253 F.3d 215 (5th Cir. 2001) ........................................................ 19

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994) ........................................................ 15

*Tunica Web Advertising v. Tunica Casino Operators Association, Inc.*,
496 F.3d 403 (5th Cir. 2007) ................................................... 18, 19

*United States v. Borden Co.*,
347 U.S. 514 (1954) .......................................................................... 1

*United States v. Hilton Hotels Corp.*,
467 F.2d 1000 (9th Cir. 1972) ...................................................... 13

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ............................................ 17, 18, 22

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312 (2007) ............................................................... 4, 15, 21

**Statutes & Regulations**

15 U.S.C. § 1 ........................................................................... 5, 8, 14

**TABLE OF AUTHORITIES—Continued**

Page(s)

15 U.S.C. § 15 ............................................................................ 9

28 C.F.R. § 50.6 ....................................................................... 24

**Rules**

Fed. R. App. P. 29(a) ............................................................... 2

**Other Authorities**

IIA Phillip E. Areeda, Herbert Hovenkamp, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) ....................... 11, 12, 13, 15

The United States Department of Justice has primary responsibility for enforcing the federal antitrust laws and a strong interest in their correct application. The Department has a significant interest in preventing unduly restrictive interpretations of "antitrust injury." While proof of antitrust injury is not required in federal antitrust enforcement actions, it is required in private antitrust litigation, which complements government actions by deterring antitrust violations. *See United States v. Borden Co.*, 347 U.S. 514, 518 (1954) (private actions "supplement[] government enforcement of the antitrust laws" because "private and public actions were designed to be cumulative, not mutually exclusive").

The district court here improperly analyzed antitrust injury—conflating it with the merits—and unduly restricted the scope of conduct that can constitute a group boycott. Correcting these legal errors furthers "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955).

The Department of Justice previously has filed amicus briefs on the correct legal interpretation of the antitrust-injury requirement. *See*, *e.g.*, Brief for the United States of America as Amicus Curiae in Support of Neither Party, *DirecTV,*

1

*LLC v. Nexstar Media Group, Inc.*, 162 F.4th 295 (2d Cir. 2025) ([Dkt. No. 54.1](#)), 2024 WL 7020946; Brief for the United States of America as Amicus Curiae in Support of Neither Party, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022) ([Dkt. No. 34](#)), 2021 WL 2387534; Brief for the United States of America as Amicus Curiae Supporting Plaintiffs-Appellants, *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262 (9th Cir. 2022) ([Dkt. No. 18](#)), 2020 WL 4026506.

We file this amicus brief under Federal Rule of Appellate Procedure 29(a). This brief focuses on the adequacy of the allegations in the complaint and expresses no view on if there is ultimately an antitrust violation.

## STATEMENT OF ISSUES PRESENTED

This brief addresses two issues:

1.      Whether the district court erred by using an improper approach for evaluating antitrust injury.

2.      Whether the district court erred by unduly limiting the scope of conduct that can constitute an unlawful group boycott.

## STATEMENT

1.      Plaintiff X Corp. operates the social media platform formerly known as Twitter.[1]  Defendants are domestic and foreign companies that advertise their

---

[1] The facts in this Statement come from the Second Amended Complaint.  On a motion to dismiss for failure to state a claim, the district court must "accept all

products online, plus (until its recent settlement) a global non-profit organization through which marketers pursue their collective interests, the World Federation of Advertisers ("WFA"). X sells digital display advertising space directly to advertisers and advertising agencies that purchase advertising on behalf of advertisers. Second Amended Complaint ("SAC") ¶ 35. Like other social media companies, X auctions its advertising inventory to advertisers, who compete against each other "head-to-head" by bidding for the available inventory. *Id*. ¶ 151.

Some online advertisers do not want their advertisements to appear in connection with, or adjacent to, some types of sensitive non-advertising content, and therefore have an interest in the standards used by social media companies to moderate content. SAC ¶ 63. In the past, advertisers typically negotiated individually with each social media company to avoid unwanted content. *Id*. Each advertiser sought to protect its brand; acting unilaterally and in rivalry with one another, advertisers were unable to force social media platforms to adopt their desired standards for content more generally. *Id*. ¶¶ 44, 64. To do that, they would have to coordinate. *Id*. ¶¶ 63-64.

Therefore, in 2019, WFA and some of its members founded the Global Alliance for Responsible Media ("GARM") to "leverage the collective market power of its advertiser members to advance their economic interests by forcing changes

well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

to the business operations of digital media and social media platforms that sell advertising inventory to GARM members or to their clients."  SAC ¶ 43.[2]  GARM members collectively exercise monopsony power.[3]  *Id*. ¶ 40 (GARM included the "Big Six" advertising agency holding companies, WFA accounts for "roughly 90% of brand spend on advertising," and "GARM members collectively exercise market power in the advertising market"), ¶ 153.

GARM promulgated "Brand Safety Standards" that govern the display of specified types of sensitive content, specify techniques to implement the standards, and set common measures for how the standards are implemented. SAC ¶¶ 48-65.  Allegedly, GARM members had to act collectively to force social media platforms to adopt the Brand Safety Standards, *id*. ¶¶ 63-64, and adoption of the standards has the effect of shifting some of the cost of monitoring content from individual advertisers to social media platforms.  *Id*.

In 2022, WFA became "concerned that [Elon] Musk's acquisition of Twitter

---

[2] GARM includes some social media platforms, like Pinterest, but the SAC alleges that GARM was "dominated and controlled by advertisers" and that social media platforms were excluded from the Steer Team that governed GARM.  SAC ¶ 41.  Twitter was a member of GARM.  *Id*. ¶¶ 96, 122.

[3] "Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007) (citations omitted).

could mark a change in Twitter's implementation of and adherence to the GARM Brand Safety Standards."  SAC ¶ 93.  WFA then allegedly triggered an advertiser boycott of Twitter through public statements by WFA, GARM, and their members. *Id*. ¶ 95.  The publicly-stated terms of the boycott were "that Twitter must implement and adhere to GARM's Brand Safety Standards to the satisfaction of GARM as a condition of WFA members purchasing advertising from Twitter."  *Id*. ¶ 94.  The advertising agency members of GARM then issued announcements recommending to their clients that they suspend paid advertising on Twitter, *id*. ¶ 104, and those recommendations were widely followed, *id*. ¶ 106.

As the boycott took effect in November-December 2022, "at least eighteen GARM-member advertisers stopped purchasing advertising from Twitter either in the United States or worldwide."  SAC ¶ 137.  Of the remaining GARM-member advertisers, "dozens more substantially reduced their purchases of advertising from Twitter (and then X) over the course of 2023, in many instances by over 70 percent."  *Id*.  The boycott allegedly "continues to the present day," *id*. ¶ 141.

2.      X filed suit, alleging claims for a continuing group boycott and unlawful information exchange, both under Sherman Act Section 1, 15 U.S.C. § 1.  X alleged that the boycott has caused it to lose revenue from existing customers, new customers are deterred from purchasing from X, and the price that remaining advertisers are willing to pay for advertising space on X has declined.  SAC ¶ 154.

X allegedly has become "a less effective competitor to other social media platforms in the sale of digital advertising and in competing for user engagement on its platform."  *Id*. ¶ 155.  In addition, X alleges, "GARM-member advertisers and advertising agencies are paying prices above competitive levels for advertising inventory purchased from social media platforms deemed by GARM to be adhering to the GARM Brand Safety Standards."  *Id*. ¶ 143.

Defendants moved to dismiss for failure to state a claim.  The district court granted that motion on the sole ground that X did not establish that it suffered antitrust injury, which is a component of private plaintiff antitrust standing.  *X Corp. v. World Fed'n of Advertisers, et al.*, 826 F. Supp. 3d 772, 809-13 (N.D. Tex. 2026).  But instead of examining whether X suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *id*. at 809 (citation omitted), which is the Supreme Court's test for antitrust injury, the court addressed the merits issue of whether X had sufficiently alleged a group boycott.

The court first stated a rule that an illegal boycott "must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement."  826 F. Supp. 3d at 809; *see also id*. at 810 (claim must "directly or indirectly involve the plaintiff's competitor").  X, however, is a social media platform that sells advertising space while the defendants are advertisers and not

X's competitors. *See id*. at 810.

Next, the court considered two possible understandings of the SAC and concluded that "these allegations do not amount to an antitrust claim." 826 F. Supp. 3d at 810. The court considered whether the Defendants' conduct (i) allowed a competitor of X to corner the supply market for online advertising space, and (ii) whether it restrained X from selling to its downstream customers. The court did not, however, consider the SAC's allegations that would support other theories of group boycott, including whether the Defendants acted as monopsonists to deprive X of a critical input and whether the Defendants acted in concert to enforce a product quality standard.

The court concluded that "although a group boycott is alleged, there is no antitrust violation here," 826 F. Supp. 3d at 812-13, and "[b]ecause X does not allege that Defendants acted to restrain competition, it has failed to state either of its claims under the Sherman Act." *Id*. at 813. The court then denied leave to amend on the ground that "[t]he very nature of the alleged conspiracy does not state an antitrust claim," *id*., and dismissed the SAC with prejudice.

## SUMMARY OF ARGUMENT

The district court's antitrust-injury analysis is flawed in two respects. First, the court did not follow this Court's approach for evaluating antitrust injury as a threshold screen but instead conflated antitrust injury with the merits. Rather

7

than assuming the existence of a group boycott and then examining whether X's alleged injuries followed from the boycott, as it should have done, the court (mistakenly) determined that X did not sufficiently allege a group boycott and then reasoned backwards to hold that X did not suffer antitrust injury. That reasoning is incorrect because a plaintiff can sufficiently allege antitrust injury even if it also fails to allege all the elements of a substantive violation.

Under a proper analysis, X sufficiently alleged antitrust injury. X's alleged injuries flow directly from the Defendant advertisers' alleged agreement not to compete against each other for advertising space on X. And X's alleged injuries are of the type that antitrust law seeks to prevent because the alleged boycott is an attempt to influence the quality or features of X's product. The antitrust laws presume that competition rather than collusion will generate the highest quality products in the long run.

Second, the district court unduly limited the scope of conduct that can constitute a group boycott. The court seemed to require, as a prerequisite for illegality under Section 1, that a competitor of X either directed the boycott to exclude X from the market or coerced third parties into refusing to deal with X. But there is no such rigid rule. Supreme Court and circuit precedent make clear that combinations designed to force the victim to change its business behavior, such as by modifying its product, terms of sale, or with whom it will deal, can be

unlawful without any design to eliminate the victim as a competitor or any coercion of third parties.  X adequately alleges such a boycott here.

### ARGUMENT

The "Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).  It "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress[.]" *Id.*  Because it would be "inimical" to these principles to "award damages for losses stemming from continued competition," *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990), the Supreme Court has construed Section 4 of the Clayton Act, 15 U.S.C. § 15, to require private plaintiffs to show "antitrust injury" as a necessary component of antitrust standing.  *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983).

"Antitrust injury" means injury caused by the defendants' conduct that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  A private plaintiff therefore must show that his "loss stems from a competition-reducing aspect or effect of the defendant's behavior."

9

*Atl. Richfield*, 495 U.S. at 344.

To illustrate, in *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480 (5th Cir. 2022), Pulse suffered antitrust injury when Visa used its market dominance to "impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees," so that Pulse was "squeezed out of the market." *Id*. at 491. The "link between Pulse's injury and Visa's alleged anticompetitive conduct" was "plain." *Id*. But Pulse did not suffer antitrust injury when different conduct by Visa caused Pulse to lose its exclusive-dealing arrangements with merchants, which resulted in increased competition from Visa. *See id*. at 489-90. Similarly, in *Ellis v. Salt River Project Agricultural Improvement & Power District,* 24 F.4th 1262, 1274 (9th Cir. 2022), the plaintiff electric utility customer suffered antitrust injury when the utility imposed a pricing scheme that discouraged customers from installing solar-energy systems that would compete with the utility. The plaintiff was "directly and economically hurt by" the scheme's higher prices.

The district court here did not examine the link between the Defendants' allegedly anticompetitive conduct and X's alleged injuries. Instead, the court erroneously engaged in a quasi-merits analysis of whether X had stated a claim for a group boycott. And even considering the court's decision as a merits analysis, it erred by seeming to adopt a rule that one or more of X's competitors had to be involved in the alleged boycott and by overlooking the SAC's allegations that

10

support alternative theories of a group boycott.

## I. The District Court Improperly Conflated Antitrust Injury With the Merits.

Antitrust injury should be a quick and easy-to-apply screen that weeds out claims of injury from increased, rather than decreased, competition, *see Brunswick*, 429 U.S. at 488. But "courts have unfortunately denied standing when they really meant that no violation occurred." IIA Phillip E. Areeda, Herbert Hovenkamp, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335f (5th ed. 2021) ("*Antitrust Law*"). The district court committed that error here by turning its antitrust-injury analysis into a quasi-merits analysis of whether X had pled a group boycott. The court said that X's allegations "do not amount to an antitrust claim," 826 F. Supp. 3d at 810; that "although a group boycott is alleged, there is no antitrust violation here," *id*. at 812-13; that X "has failed to state either of its claims under the Sherman Act," *id*. at 813; and that the "nature of the alleged conspiracy does not state an antitrust claim," *id*.

In particular, the district court failed to follow this Court's repeated admonition that, to evaluate antitrust injury in private cases, the court should assume an antitrust violation has occurred and then determine whether the plaintiff has experienced antitrust injury from the violation. *See Pulse Network*, 30 F.4th at 488 (in considering antitrust standing "we assume *arguendo* that each policy violates the antitrust laws"); *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d

732, 738 (5th Cir. 2015) ("In analyzing this standing issue, we assume that Sanger's allegations of exclusive dealing amount to an antitrust violation."); *see also Antitrust Law* ¶ 335f ("To test standing in a private suit . . . the court should assume the existence of a violation and then ask whether the . . . standing elements are shown."). Antitrust injury "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Thus, "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing." *Id*. If the plaintiff does not allege or eventually show that an antitrust violation occurred, then dismissal or summary judgment should be granted on the merits—not smuggled into standing requirements. *See id*. at 306.

The district court did not follow these steps. The court did not assume the existence of a group boycott. By conducting a quasi-merits analysis, it required allegations "of the substantive violations as a prerequisite to antitrust injury," an approach this Court criticized as "inefficient and confusing," *Dr.'s Hosp.*, 123 F.3d at 306. And the court did not focus on X's position in the market but rather looked to effects on market-wide competition by asking whether the boycott allegedly allowed a competing social media company to corner the supply market for online

12

advertising space.

If a boycott is assumed, X's alleged injury follows directly from it, and X is "not a remote or indirect victim of the alleged scheme." *Dr.'s Hosp.*, 123 F.3d at 306. X supplies advertising space, and suppliers usually have antitrust injury if they are "the immediate victims of a boycott." *Antitrust Law* ¶ 335h; *cf. United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1002 (9th Cir. 1972) (the "necessary and direct consequence" of defendants' joint refusal to deal "was to deprive uncooperative suppliers of the opportunity to sell to defendant hotels in free and open competition with other suppliers, and to deprive defendant hotels of the opportunity to buy supplies . . . in accordance with the individual judgment of each hotel"). X's alleged injury flows from the competition-suppressing effect of a group of major advertisers agreeing to stop competing with each other for advertising space on chosen platforms, not from some other source.

X's alleged injury is also "of the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489. The alleged boycott is an attempt to influence the quality of a product: X's advertising space. A fundamental purpose of the antitrust laws is to allow competition, not collusive behavior, to determine quality. *See Nat'l Soc'y of Pro. Engr's v. United States*, 435 U.S. 679, 695 (1978) (the antitrust laws assume that "competition will produce not only lower prices, but also better goods and services"); *N. Pac. Ry.*, 356 U.S. at 4 (the Sherman Act "rests

on the premise that the unrestrained interaction of competitive forces will yield . . .

the highest quality"). In a competitive market, if GARM's Brand Safety Standards

are superior on the merits (*i.e.*, they attract more advertisers than other standards

or no standards), then social media platforms like X should adopt them

unilaterally. That some platforms do not adopt them, in part or in full—hence the

need for GARM to boycott—suggests that there could be some market demand for

different standards. A basic purpose of Sherman Act § 1 is to prevent concerted

action that interferes with that market mechanism. *Cf. FTC v. Ind. Fed'n of Dentists*,

476 U.S. 447, 459 (1986) (dentists' concerted refusal to offer a service that some

patients covered by group dental insurance would want was an antitrust violation

under the rule of reason); *PLS.com*, 32 F.4th at 836 (competitor offering a niche

product that met some market demand stated a claim for group boycott when its

product was excluded by association rule).

The district court relied on language in *RX Solutions., Inc. v. Caremark, L.L.C.*,

164 F.4th 436 (5th Cir. 2026), *see* 826 F. Supp. 3d at 809, but *RX Solutions* is not to

the contrary. That decision reasoned that the plaintiff did not allege harm to

"consumers," 164 F.4th at 444, but under the antitrust laws, the term "consumers"

is not limited to *end-user* consumers. Intermediate-level suppliers like X can also

be "consumers" for antitrust purposes. When buyers form a buying cartel,

> [t]he supplier's loss also constitutes antitrust injury, for it reflects the
> rationale for condemning buying cartels—namely, suppression of

> competition among buyers, reduced upstream and downstream output, and distortion of prices. . . . Notwithstanding numerous statements to the effect that the primary or even exclusive concern of antitrust is "consumer" welfare, upstream, or monopsony, injury to suppliers is treated in largely the same way as injury to consumers.

*Antitrust Law* ¶ 350b; *see also Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (allegations of a buying cartel stated a Sherman Act claim "even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers"); *PLS.com*, 32 F.4th at 833 ("Businesses that use a product or service as an input to provide another product or service can be consumers for antitrust purposes.").

Correcting the district court's erroneous antitrust-injury analysis is important because antitrust injury to intermediate-level suppliers like X can flow from a reduction of competition in an upstream market regardless of the ultimate effect on competition downstream. *See Weyerhaeuser*, 549 U.S. at 324-25 (conduct can harm competition in an input market "[e]ven if output prices remain constant" for end users); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (milk producers sufficiently alleged antitrust injury from collusive price manipulation in upstream market for fluid milk, even though defendants' conduct may have lowered prices for cheese products to downstream consumers); *Sullivan v. NFL*, 34 F.3d 1091, 1101 n.3 (1st Cir. 1994) ("Just because consumers of 'NFL football' are not affected by output controls and price increases does not mean that

consumers of a product in the relevant market are not so affected."); *Fishman v. Est. of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) (a plaintiff is not required, "as a prerequisite to maintain an antitrust suit," to articulate "how the welfare of the ultimate consumer has been diminished by an injury to competition at *another level*"). And in any event, colluding to force an intermediate-level social media platform to conform to uniform content moderation standards *can* harm end-user consumers by limiting platform differentiation and thus consumer choice.

## II. The District Court Erred In Its Merits Analysis of Group Boycotts.

Even viewed as a merits analysis, the district court's reasoning is incorrect. Contrary to the court's apparent understanding, there is no rigid rule requiring that a boycott be directed by a competitor of the victim or that a competitor be involved in the boycott at all. And the SAC presents viable monopsony and standard-setting theories that the district court did not consider.

### A. The Alleged Group Boycott Can Be Unlawful Even If One of X's Competitors Did Not Direct It.

The district court seemed to require that a boycott take the form of one or more firms trying to keep a (typically new) competitor out of the market at the same level of distribution, sometimes by coercing third parties to refuse to deal with the new competitor. The court thus faulted X for "not alleg[ing] that an advertising space supplier (*i.e.*, one of X's competitors) directed the Defendants' boycott." 826 F. Supp. 3d at 811; *see also id.* at 809 ("illegal group boycotts must

16

involve a competitor at some level who seeks to restrain competition against an outsider to the agreement"); *id*. at 810 ("If the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury.").

Boycotts often take that form, but they are not so limited.  In *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee.*, 467 F.2d 178, 186-87 (5th Cir. 1972), this Court described the Supreme Court's decisions applying *per se* illegality to group boycotts as falling into roughly three categories: (i) horizontal combinations trying to exclude direct competitors from the market; (ii) vertical combinations among traders at different market levels trying to exclude from the market direct competitors of some member(s) of the combination; and (iii) combinations "designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors."  *Accord United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1366 (5th Cir. 1980) (same categories).

In discussing examples fitting the third category, this Court cited *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941), where the "original" designers' refusal to sell their creations to retailers who purchased and sold copies of those designs was intended to combat "style piracy" and not to eliminate the retailers as competitors, and *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951) (liquor manufacturers' collective refusal to sell to price-cutting wholesalers), *see Realty Multi-List,* 629 F.2d at 1366.  More recent cases

include *Indiana Federation of Dentists*, where the dentists' concerted refusal to deal was intended to influence the behavior of insurers, and *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411 (1990), where no third parties were involved and the indigent defendants' lawyers' boycott was designed to increase their fees, not to eliminate any competitors.

This Court's precedent agrees that a *per se* unlawful boycott does not require that the victim be a competitor to any of the boycott conspirators. As this Court made clear in *Tunica Web Advertising v. Tunica Casino Operators Association, Inc.*, 496 F.3d 403 (5th Cir. 2007), "[n]othing in *Northwest Wholesale Stationers* or the Supreme Court's later cases . . . establishes a bright-line rule limiting the application of the *per se* rule to [group boycott] cases in which the victim is a competitor of at least one of the conspirators, and no such rule is justified under the Court's precedents." *Id.* at 413; *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015) (*Tunica* "potentially expanded per se liability" by reversing summary judgment where the district court concluded that the *per se* rule applies only to group boycott cases "where one of the conspirators is a direct competitor of the victim.").

The district court erred by seeming to require the alleged boycott to fit into the first or second categories described above, which are the most common forms of boycotts, while overlooking the third category and the controlling precedent of

*Tunica*.[4]  The boycott alleged here tries to "influence coercively the trade practices" of X, not to eliminate it as a competitor, and X did not have to allege that one of its competitors either orchestrated or participated in the boycott.  Indeed, *Tunica* is in part analogous to this case.  When the plaintiff there attempted to sell advertising space on its website to each casino operator individually, each one refused to buy.  The plaintiff alleged an agreement among the casino operators to make these refusals, and this Court held that the plaintiff's allegations created a fact issue on the Section 1 element of concerted action and that, if such an agreement existed, it could be *per se* unlawful although the plaintiff was not in competition with any defendant.  *See* 496 F.3d at 412-14.

Moreover, even if the *per se* rule is inapplicable to the alleged group boycott here, it could still violate Section 1 under a rule-of-reason analysis.  The rule of reason is a "fact-specific assessment" of "the restraint's actual effect on competition," *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018), that accounts

---

[4] The cases cited by the district court at 826 F. Supp. 3d at 809-10, are consistent with Supreme Court decisions recognizing unlawful boycotts that did not involve coercion of third parties or a purpose to exclude a competitor from the market.  *MM Steel* explained that a group boycott is "often" an agreement to exclude a new competitor by coercing a third party, but it did not restrict group boycotts to that scenario.  806 F.3d at 844.  Similarly, *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001), quoted *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), to support the point that "an integral part of a boycott is *often* bringing pressure to bear ('persuading or coercing') on [third parties]" (emphasis added), but again did not purport to limit group boycotts to that fact pattern.

for "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; [and] the nature of the restraint and its effect, actual or probable," *Board of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238 (1918). A plaintiff can establish a "substantial anticompetitive effect" for purposes of the first step of the rule of reason analysis either directly, with "proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market," *PLS.com*, 32 F.4th at 834 (citation omitted), or indirectly by showing that the defendants have market power plus "some evidence that the challenged restraint harms competition," *American Express,* 585 U.S. at 542.

## B. There Are More Viable Boycott Theories Than the District Court Considered.

The district court considered two theories by which the Defendants' conduct could state a claim for group boycott: (i) by allowing one or more of X's competitors to corner the supply of advertising space, or (ii) by restraining X from selling to its downstream customers. This focus was too narrow. A wide variety of conduct can constitute a group boycott. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) (citing cases).

For example, there can be monopsony boycott theories, because antitrust law is as concerned with the anticompetitive actions of buyers as it is with those of sellers. *See NCAA v. Alston*, 594 U.S. 69 (2021) (NCAA had monopsony power as

buyer of student-athletes' services); *Weyerhaeuser*, 549 U.S. at 322 ("The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization."); *Mandeville Island Farms,* 334 U.S. at 235 (price-fixing conspiracy by purchasers).

X alleges just such a monopsony theory here. The SAC alleged, or permits the reasonable inference, that the conspiracy is a horizontal agreement among competing firms, *see* ¶ 151; that the Defendants have monopsony power, *id*. ¶¶ 40, 153; and that the Defendants deprived X of an essential input—advertising revenue, which is essential because X is free to the users of its platform—it needs to compete against other social media platforms, *id*. ¶¶ 91 (ninety percent of Twitter's revenue came from advertising), 155 ("As a result of the boycott, X became a less effective competitor to other social media platforms in the sale of digital advertising and in competing for user engagement on its platform.").

Substantial precedent holds that unreasonable group boycotts can include a situation where firms that compete with one another join together to deprive the plaintiff of a critical input it needs to conduct its business. *E.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) (combination of chain retailer, distributors, and manufacturers deprived the plaintiff home appliance retailer of home appliances); *Silver v. New York Stock Exchange*, 373 U.S. 341, 347-48 (1963) (members of New York Stock Exchange engaged in group boycott of Silver by

cutting off private wire telephone connections between Silver's businesses and the Exchange); *MM Steel* (horizontal conspiracy to deprive steel distributor of steel); *Realty Multi-List,* 629 F.2d at 1361 ("A concerted denial of access to RML's listing service, when RML members have agreed to pool and share their listings, amounts to a group boycott of the nonmember.").[5]

The district court never considered this theory, however. On remand, it should consider whether a monopsony theory states a claim for a group boycott. Although the court need not decide definitively at this stage whether *per se* or rule of reason is the appropriate mode of analysis, the SAC appears to contain sufficient allegations to proceed under both approaches. A group boycott "generally" falls into the *per se* category if "the boycotting firms possess[] a dominant position in the relevant market," they "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," and the defendants' conduct is "not justified by plausible arguments that [it was] intended to enhance overall efficiency and make markets more competitive." *Nw. Wholesale Stationers,* 472 U.S. at 294.

---

[5] X did not have to allege that the boycott *completely* cut off its access to advertising revenue. *See PLS.com*, 32 F.4th at 835-36 (citing *Klor's* and quoting *Nw. Wholesale Stationers*, 472 U.S. at 295 n.6 ("a concerted refusal to deal . . . on substantially equal terms . . . might justify per se invalidation if it place[s] a competing firm at a severe competitive disadvantage")).

Alternatively, the SAC supports a monopsony group boycott claim under the rule of reason because it alleged a relevant antitrust product market of "the market for digital advertising on social media platforms," *id*. ¶¶ 146, 150; direct anticompetitive effects of the boycott in the form of above competitive-level prices for advertising space on social media platforms other than X, *id*. ¶ 143; and "some evidence" of anticompetitive effects in the advertising market in the form of GARM members no longer bidding against each other for advertising space from social media platforms that GARM has boycotted. *See also id*. (boycott means that other social media platforms no longer need to compete with X on price in the sale of advertising to GARM-member advertisers and agencies).

Likewise, remand may be appropriate for the district court to consider boycott theories based on concerted enforcement of a product quality standard. For instance, there can be viable boycott claims where a private association of competitors has set, and used its market power to enforce, a product standard that excludes the plaintiff's product. *See*, *e.g.*, *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961). "Concerted efforts to enforce (rather than just agree upon) private product standards face more rigorous antitrust scrutiny." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 n.6 (1988). The SAC contains allegations that GARM and its members formulated the Brand Safety Standards and then agreed to enforce, and did enforce, them against X and other

social media platforms.  *See* SAC ¶¶ 48 ("WFA organized GARM in part to promulgate standards relating to the placement of advertising on digital media and social media platforms."), 49 (GARM's "core work" includes "creating industry standards"), 65 ("By forcing digital media and social media platforms to adopt and adhere to the Brand Safety Standards, GARM went much further than setting voluntary standards."), 66-90 (GARM members agreed to enforce the Brand Safety Standards). [6]

**CONCLUSION**

The Court should hold that the district court erred in its antitrust-injury analysis; that a boycott need not be directed by a competitor of the victim; and that there are additional boycott theories beyond the two considered by the district court.

August 12, 2026

Respectfully submitted.

/s/ Steven J. Mintz

---

[6] The Antitrust Division of the Department of Justice has in the past issued business review letters under 28 C.F.R. § 50.6 stating that it had no present intention to take enforcement action against certain private associations that proposed to adopt voluntary standards, expressly limited to the facts of those situations.  Those situations did not involve alleged boycotts.  The facts of those situations also did not suggest that the standards would have any significant economic consequences for non-association members or any anticompetitive effect in the relevant markets, while the alleged facts here (taken as true on a motion to dismiss) are the opposite.

STANLEY E. WOODWARD, JR.
  *Associate Attorney General*

EMILY CLAIRE MIMNAUGH
  *Deputy Associate Attorney General*

MICHAEL WEISBUCH
  *Senior Counsel to the Associate
  Attorney General*

G. CHARLES BELLER
  *Deputy Assistant Attorney General*

ETHAN S. HOFFMAN
  *Counsel to the Assistant Attorney General*

DANIEL E.HAAR
NICKOLAI G. LEVIN
STEVEN J.MINTZ
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division
  950 Pennsylvania Ave., NW
  Washington, DC 20530-0001
  Tel. 202-353-0256

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

this document contains 5,957 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook.

/s/ Steven J. Mintz

Steven J. Mintz
Attorney for the United States

Dated: August 12, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2026, I electronically filed the foregoing Brief for the United States of America as Amicus Curiae in Support of Plaintiff-Appellant with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Steven J. Mintz

*Attorney*